# STATE OF CALIFORNIA *v.* MOORE.

The interest of the occupant of a mining claim is property, and, under the Constitution, it is in the power of the Legislature to tax such property.

The whole course of legislation and judicial decisions in this State, since its organization, has recognized a qualified ownership of the mines in private individuals.

The term "property in lands" is not confined to title in fee, but is sufficiently comprehensive to include any usufructuary interest, whether it be a leasehold or a mere right of possession. Several persons may have, in the same land, a property which is subject to taxation; and it is not perceived that the fact that the property of the Government is exempt from taxation affects the right to tax the interest which private individuals have acquired in the same property. Exemption from taxation is a privilege of the Government, not an incident to the property.

There is no force in the objection that the value of a mining claim, which depends upon the amount of the precious metals it contains, must necessarily be left to conjecture.

The universal standard of value is the amount of money which can be realized by a sale of the property, and this will apply as well to mining claims as other lands.

The Legislature having expressly exempted mining claims from the operation of the Revenue Act, it cannot be presumed that it intended indirectly to subject them to taxation by levying a tax on the price paid for them.

Money invested in the purchase and opening of mining claims, is not within the provisions of that portion of the Revenue Act which provides for the levy of a tax on "all capital loaned, invested or employed in any trade, commerce or business whatsoever."

APPEAL from the Fourteenth District, County of Nevada.

State of California *v.* Moore.

This is an appeal by defendant from a *pro forma* judgment rendered for the plaintiffs in an action instituted to try the legality of the tax levied on the money expended in the purchase of mining claims.

The pleadings and agreed statement show the following facts, viz:— that the defendant's claims are situated upon, and form a part of the public domain of the United States: that the sum of twenty thousand dollars was paid by him some three years since for such claims; and that the further sum of five hundred dollars has been expended in constructing a tunnel for the working of the same.

On the nineteenth day of July, 1858, the County Assessor proceeded to assess the sums above mentioned, as the property of defendant; and on the twenty-first day of July, 1858, this suit was instituted to recover the amount of the tax alleged to be due thereon.

*McConnell & Niles* for Appellant.

I. The assessment in this case was contrary to the Statute Law of this State, and the defendant is under no legal obligation to pay the amount for which he was assessed.

This is the proposition upon which we shall chiefly rely, and to which we shall direct the bulk of our reasoning.

The Revenue Law of this State expressly exempts mining claims from taxation. Revenue Act, sec. 2; Wood's Dig. p. 416, article 3,004.

This portion of the Act is certainly direct and unambiguous enough to satisfy any one.

But a part of another section of the law has given rise to the construction now sought to be fastened upon it by respondents.

Section 5, of the same Act, in defining the several sorts of property mentioned in the Act, uses the following language: "The term personal property, whenever used in this Act, shall be deemed and taken to mean, and it is hereby declared to mean and include all household and kitchen furniture; all law, medical, and miscellaneous libraries; all goods, wares, and merchandise; all chattels, of every kind and description; all money on hand, or on deposit in banks or with individuals; all money at interest, secured by mortgage or otherwise; gold dust, solvent debts, stocks of goods on hand, horses, mules, oxen,

4

cows, calves, beef cattle, hogs, sheep, goats, &c., &c.; all works and improvements; all store ships and hulks; all steamers, &c.; *all capital loaned, invested or employed in any trade, commerce, or business whatsoever,*" &c., &c.    Wood's Digest, p. 616.

It is said, we believe, that mining is one of the many sorts of business contemplated by the statute; and, therefore, money invested in mining is personal property within the meaning of the Act; and that being personal property, within the meaning of the Act, it is therefore subject to taxation.

In the case at bar, the capital assessed was expended in the *purchase* of mining ground.    That is to say, at the time it was assessed and the amount of the tax ascertained, it had actually ceased to belong to the person in whose name it was assessed, (the defendant) but had passed to and become the property of those from whom he purchased. The result would be, that the defendant would pay taxes upon the property of another man—while at the same time the recipient of the money—the vendor of the claims would be paying the taxes on it simply as money.

The *reductio ad absurdum* was never more applicable than here. It establishes beyond a doubt, that the money paid by the defendant for his claims, cannot be taxed *as capital.*

It may be urged, however, that the object of the Legislature was to compel all kinds of business and persons to contribute something towards the support of the State.

That therefore, while exempting mining claims, *eo nomine,* from taxation, because of the great uncertainty of their yield, and the hazardous nature of the business, they still intended, in those cases where an individual had, by paying a given sum for a mining claim, ascertained and fixed its value, to compel him to pay taxes upon the value so ascertained and fixed by his own act.    We say it is possible this position may be assumed.    But it is scarcely probable; for it assumes the existence of a difference which does not exist, between a mining claim and the pecuniary value of a mining claim.

It is true, that the logician or the metaphysician may discover a distinction between a thing and its value; but in the common affairs of life, the terms are more frequently used as synonymous.    Capital,

in its broadest sense, as used by philosophers and political economists, means everything of value, which is created by labor. But in the restricted and ordinary sense—the sense in which the statute uses it—it means money. Money is used as a universal representative of capital—a fixed and definite, though purely conventional standard of value. At the same time, it is not an absolute, but a relative standard; a standard that may and does vary, as circumstances vary.

The word " value " is defined to mean " that property, or those properties of a thing which render it useful or estimable; or the degree of that property, or of such properties. The real value of a thing, is its utility; its power, or capacity of procuring or producing good." Webster's Dictionary, verb. "value."

It is said by one, that if " a man seized of lands in fee, by his deed granteth to another the profit of those lands, to have and to hold to him and his heirs, and maketh livery *secundam formam chartae*, then the whole land itself doth pass; for what is the land but the profits thereof; for thereby vesture, herbage, trees, mines, and all whatsoever, parcel of the land doth pass." Coke on Lit. 4, (b).

The word " profit " is defined to mean a gain or advantage arising either from labor, or the use of a thing. It is not a quality or property of the thing, but exists apart from it; while the word " value " includes all of those inherent qualities or properties which concur to make the thing useful or desirable to men.

If, therefore, the word profit, when used in a conveyance, will pass the land, the word *value* will have at least the same operation.

We would here remark, that the authorities bearing on this question are very few.

The case of Raguet *v*. Wade, is that most nearly in point. The question in that case was, whether the Act of the Ohio Legislature, taxing capital employed in trading in foreign goods, &c., was constitutional. This is a very different question from that presented by the present case. But it will be seen by a careful perusal of that case, that the Ohio Court regarded the statute as laying a tax on the foreign goods themselves. That is, they treated the terms, " capital employed in trading in foreign goods," as meaning no more or less than " foreign goods;" and the decision went off on the general

ground of the right of the State to tax all goods, whether domestic or foreign. Raguet v. Wade, 4 Hammond Ohio Rep. p. 108—115.

It seems to us conclusive, from the foregoing, that a tax upon the value of defendant's claims, as ascertained by the price he paid for them three years since, is a tax upon the mining claim itself. The only difference between such a tax, and a direct tax upon the claim, consists in the one being upon the actual value of the claim, and the other being upon an arbitrary value, ascertained and fixed in an arbitrary manner.

By the first mode, the price paid is not considered—the only inquiry being as to the *present value;* by the other mode, the present value is of no consequence, the only question being—what did the owner pay for it?

Hence, according to the latter method, it is quite possible for a man to pay an enormous tax upon a thing which possesses no present pecuniary value. If money expended in the purchase of mining claims can be taxed at all, it follows that the time of the purchase cannot affect the right to tax. Hence, a man may have expended twenty thousand dollars in buying claims three years ago, (as in the case at bar); he may have extracted so great a proportion of the gold therefrom as to leave them comparatively valueless; still, if respondents' reasoning is correct, he is liable to pay taxes on the money which ceased to be his three years ago, notwithstanding the decrease in the actual value of the claims.

We think such a doctrine is at war with the entire theory of taxation. A tax, properly so called, is a contribution imposed by the Government, and paid by the citizen for the support of the State. Story on the Const., sec. 472; Webster's Dic. verb. Tax.

It is imposed, either on the person of the citizen, or upon his property. In either case, it is regarded as the equivalent which the citizen pays for that protection which the State alone can give him. In the one case, it is the price he pays to secure his personal safety; in the other, to secure the safety of his property.

But if the purchaser of a mining claim pays taxes on the purchase money, he is really paying the State for its protection of another man's money, and not of his own. This conclusion is evident, pro-

vided we regard the tax as being imposed upon the money paid, rather than upon the value of the claim; in which last case, it is, as we have shown, a tax upon the claim itself, and therefore inhibited by law.

The entire difficulty of the case seems to us to consist in the erroneous sense which the respondents put upon the language of the statute.

The operative words of the fifth section are: "all capital loaned, invested, or employed in any trade, commerce, or business whatsoever"—and the question is, in what sense did our lawgivers use the words "loaned, invested, and employed?"

The word "loan" has but one meaning, and that is its ordinary one.

The word "invest" is more comprehensive, and includes loans. When applied to the use of money, or capital, it is thus defined—"literally, to clothe money in something; as, to *invest* money in funded or bank stock; to *invest* it in lands or goods." Webster's Dic. verb. *Invest.*

Burrill defines it—"to lay out money or capital in some permanent form, so as to produce an income; to clothe it in something. Properly applied to capital not actively employed." 2 Burrill's Law Dict. verb. *Invest.*

Undoubtedly, the word "invest" is often applied to money expended in the purchase of property. But it would seem that it is only used in reference to that class of purchases, where the thing purchased itself partakes of a pecuniary nature.

We have found but a single judicial exposition of the meaning of this word, and that favors the view which we have taken of it.

We allude to the case of The People v. The Utica Insurance Co., 15 Johns. Rep., p. 391.

When a law, or a part of a law, is susceptible of two constructions—the one consistent, sensible, and constitutional—the other inconsistent, absurd, or unreasonable—the former will be preferred.

"Every interpretation that leads to an absurdity, ought to be rejected." Smith's Const. and Stat. Constr., p. 631, sec. 486.

"In mixed interpretation, the rule prevails that we must give to all doubtful words or expressions that sense which will make them produce some effect; and this effect must in general be a reasonable one,

and it must likewise be the same that the lawgivers intended to produce.    *    *    *    *    *    *    If the words or expressions are ambiguous, and are susceptible of two senses, either of which will produce some effect, the rule then goes further, and says that the effect must be a reasonable one." *Ib.*, p. 672, sec. 527.

By construing the word "invest" to mean no more than to *use* or *employ*, we avoid all difficulties and absurd consequences.

There is one other aspect in which this case may be presented by the respondent—and to which we shall refer, viz: The defendant is engaged in the business of mining, and the purchase of mining claims is simply an incident, or a necessary branch of that business. When therefore he bought the claims mentioned in the complaint, he thereby *invested money in the business of mining.*

It seems to us this is only another phase of the several positions against which we have been contending. It affects to draw a distinction between the business or employment of mining, and the mining claims upon which the business or employment is exercised. Such a distinction is rather a metaphysical subtlety, than a legal, practical entity. As a test of value, it has no existence at all. We say of a man owning and working mining claims, that he is engaged in the business of mining. But his business, apart from his claims, and the tools and engines with which he operates, has no tangible value. A man's business cannot, with strict propriety, be termed *property.* It is a mere abstraction—an intangible, an incorporeal offspring of the brain. It cannot, as such, become the subject of litigation in the Courts ; nor can it ever be directly subjected to the payment of taxes.

The capital employed in a particular business, or the revenue arising therefrom, may be, and frequently is made liable for taxes ; but never, we believe, the business itself.

We presume it will not be contended that mining claims, as such, are not exempt from taxation. The language of the Act is as direct and specific as it well can be ; and whatever may have been the intention of the Legislature in the fifth section, they certainly intended by the second section to exempt mining claims. The whole Act must be construed together ; and according to the principle already laid down, if one construction of the fifth section is consistent, and another incon-

State of California *v.* Moore.

sistent with the plain meaning of the second section—the latter construction must be rejected.

But does the miner have an *estate* properly so called in his claim? Has he such an interest as can be termed *property* in any just sense of the word? We do not think he has—and predicate our opinion upon the following grounds.

It seems to be conceded on every hand, that the gold miner's right to seek for gold on the public domain, must be referred to some implied permission from the State and Federal Governments. This Court has, in fact, on more than one occasion asserted the existence of such a permission; but it has never gone so far as to define the nature and degree thereof.

In common parlance, we speak of it as "an implied grant;" forgetting that it has none of the elements of a grant. For if we presume a grant, we thereby presume all title out of the Government. No Court in this State has yet gone so far as to ignore the primary and paramount title of Government.

Besides, the phrase "implied grant" has been used to characterize the supposed title of the miner, in those cases only where the controversy was between private parties. In a contest between the Government itself and one of its citizens, all implications and inferences cease; and the rights of the latter must be made to depend upon the actual, and not the supposed relation he occupies towards the State. As between the State and a citizen, it is absurd to say that the Court will presume a grant to the latter of the privilege of mining upon a particular portion of the public land. The Court will presume nothing. It will take the facts as it finds them; and it will find them amply sufficient to protect the rights of the citizen. The tacit acquiescence of the State and Federal Governments—to say nothing of their positive legislation—is sufficient to prove an *actual license* to him, and nothing more.

Our own opinion at least, is, that the miner operates by virtue of an *actual* (not *implied* merely) *parol license;* and that he has only the rights which such a license can confer on him.

A parol license passes no title, estate, or interest in the thing which is the subject of the license. It gives neither a *jus ad rem,* nor a *jus*

*in re.* It is not one of the received common assurances of the country. It does not figure in the books as a mode of passing title. In some few cases, Courts of Equity have interfered to prevent the perpetra· tion of a wrong by the revocation of the license ; but even those cases have not gone off upon the idea of any estate having passed to the recipient of the license.

The right acquired by a parol license, cannot in any sense of the word be called *property*. It is a mere privilege—a transient, evanescent, and revokable right. It cannot descend to his heirs, or pass to his administrators. A wife shall not be endowed of it—nor can a creditor subject it to his execution. Possessing no single element of property, it cannot, of course, be subject to taxation. Who will pretend that A's license to take fruit from B's orchard, is liable to taxation ? Yet that would be as rational a pretense, as to say that the license of the State to this defendant to take gold from its mines is liable to pay taxes.

Upon this subject of parol license we refer the Court to the following authorities : Prince v. Case, 10 Conn. R., p. 375—383 ; 2 Hare & Wallace, Am. Leading Cas., p. 676 and note ; Rerick v. Kem, 14 Serg. & Rawle, p. 267 ; Wood v. Lebetter, 13 Mees. & Wels., p. 838 ; Angell on Watercourses, secs. 285, 288, 293, 295 ; 3 Kent's Com., p. 452 ; 7 Taunton, 384—2 Eng. Com. L. Rep.

II. The tunnel of defendant is not by law subject to taxation ; and therefore the assessment upon the same is contrary to law, and void.

It is quite evident that the County Assessor viewed the defendant's tunnel in the light of an " improvement," and therefore assessed it as such.

The miner's tunnel is usually a long, horizontal, subterraneous excavation, passing into claims situated on hills or mountains, and starting from some point lower than the bed rock of the claims themselves. It is used for the twofold purpose of draining the water from the ground, and of taking out the pay dirt. Formerly, perpendicular shafts or wells were sunk from the surface of the claims, until the gravel or pay dirt was reached. But this mode was subject to serious drawbacks, arising chiefly from the accumulation of water in the shaft, and the danger of caving.

State of California *v.* Moore.

A tunnel is really nothing more than a horizontal *shaft*, (if the expression may be allowed) and answers the same purpose, though in a far more perfect manner. After a tunnel reaches the claims, the miners dig small auxiliary tunnels, or drifts to the right and left, by means of which they reach the lead, and take out the gravel that contains the gold. When shafts were in use, these drifts were also used in connection with them.

We cannot perceive any solid reason for calling a tunnel an improvement, or for separating it from the claim of which it forms part.

It is as much a part of the claim itself as a shaft, or any slight excavation in the claim. The fact that it usually costs far more money than other kinds of excavations, does not strengthen the argument against us. It is not the cost of a thing, but the use to which it is put, that must determine whether it is an improvement or not. Apart from the claims, it has not a particle of value. It is really an appurtenance to the claims; and in a conveyance of the claims, and *their appurtenances*, the tunnel would pass *ex vi termini*.

In practice, the claim and the tunnel or shaft are regarded as being identical. A man is said to work on his claims when he is at work on his tunnel, though at a considerable distance from his claims. This view of their identity has been adopted by this Court, and applied in a case in which the tunnel was commenced at a considerable distance from the claims. Packer *et als. v.* Warren Heaton *et als.*, 9 Cal. R.

Are we not warranted in the conclusion, that the express statutory exemption, by force of necessary inference, also exempts the tunnel as an appurtenance or incident of the claims ? Assuredly ; for notwithstanding the general rule that laws exempting property from taxation are to be construed strictly, there is no doubt that the exemption of the principal will enure *ex vi termini* to exempt the incident. Grants by the sovereign must receive a strict construction. Yet we well know that a grant by the Government of the principal thing will, by its own force pass the incident. The exemption of a farm will operate to exempt a right of way, or easement in running water pertaining to the farm, as well as all buildings erected thereon. So the exemption of a school-house or church will amount to an exemption of the portion of

land which is attached to it as a necessary appurtenance, as a church-yard or burial-ground.

It matters little to this view of the question, whether a tunnel is an "improvement," or not; for the tunnel is exempted as a necessary part or appurtenance of the claim.

But we maintain that a miner's tunnel is not an *improvement* within the meaning of the law. The claim to tax works of this sort is predicated, we suppose, on the fourth and fifth sections of the Revenue Act. Wood's Dig., p. 616, art. 3006, 3007.

The fourth section declares that the Assessor shall prepare a list, etc., of the various.kinds of property of each inhabitant in his county, in which he is to set down " the cash value of all improvements on public lands;" and the fifth section defines " personal property" within the meaning of the Act, to consist of a great variety of things, among which are " all works and improvements."

The word "improvement" is defined by Webster to mean " valuable additions or meliorations, as buildings, clearings, drains, fences, etc."

Burrill thus defines it: "Improvements, a term used in leases, which, according to Mr. Chitty, is sometimes of doubtful meaning. It would seem to apply principally to buildings, though generally it extends to the amelioration of every description of property, whether real or personal; but when contained in any document, its meaning is generally explained by other words"—and he refers to 1 Chitty, Gen. Practice, p. 174. Burrill's Law Dict., verb. *Improvements*.

Mr. Hilliard, speaking of " permanent improvements," instances buildings, clearings and road making, as examples. 1 Hilliard on Real Prop., p. 337.

The word *improvement* would seem to import something in the nature of a *structure*—something erected or built upon the surface of the land.

The meaning of the Legislature seems to have been to include those structures so very common in the mining region of the State, erected for habitations, for manufacturing purposes, or for purposes of trade. In many cases the owner of the improvements can scarcely be said to claim any interest in the soil upon which they are erected. Many of them contain machinery, used for a variety of purposes, but chiefly for sawing lumber and crushing quartz rock. Such machinery was mani-

festly intended by the term "works" coupled with "improvements." See cases cited *supra*, on the Law of *Parol Licenses*.

*Attorney General* for Respondent.

It is well settled that the "power of taxation among independent nations is unrestricted as to things, and, with the exception of Foreign Embassadors and agents, and their retinues, is unlimited as to persons." It may extend to all professions, trades, occupations, and *business property*. People *v.* Coleman, 4 Cal., and People *v.* Naglee, 1 Cal., page 232.

From the foregoing it follows, necessarily, that the Legislature has the *power* to tax "money invested in mining claims," or "capital invested in the business of mining."

"Capital, as applied to individuals," is those objects whether consisting of money or property which a merchant trader or *other* person adventures in an undertaking, or which he contributes to the common stock of a partnership."

It also, when used in a limited sense, "signifies money put out at interest."

The rule is, that "words of a statute, when not used in a technical sense, must be construed according to their ordinary signification."

Apply the rule to the Revenue Act, and the unavoidable conclusion is, that the Legislature meant by capital "that which a person adventures in an undertaking." This position is fortified by other language formed in the same section of the Act; for in the enumeration of objects and things which shall be held to be included within the term "personal property," we find preceding the word capital, "*all money at interest* secured by mortgage or otherwise."

If I am in error, the Legislature was guilty of repetition and an unnecessary use of terms; but if correct, then all is consistent and coherent.

"Invest" comes from the Latin word "*investio*," which signifies to "clothe" or adorn ; and when applied to money means literally to clothe it (money) in something.

Ordinarily we mean, "to lay it (money) out in such manner as to

bring in a revenue," though it is evident that the use of the term may be extended beyond the definition given.

Webster defines "Business" thus: "Employment; that which occupies the time, attention and labor of men for the purpose of profit or improvement; a *word of extension, use, and indefinite signification. Business* is a particular occupation, as agriculture, trade, mechanic art or profession; the subject of employment; that which engages the care and attention."

Mining occupies the time, attention and labor of men, and they follow it for profit. It is the one employment of the largest class of our population; in a word, it is their business. We speak of it daily as such; and if you ask a man who engages in that employment what his *business* is? he readily answers you, "Mining."

Mining was the *business* in which appellant was engaged when he gave the list of his property.

When the Legislature used this term, they meant it to be taken in its ordinary signification.

It therefore follows, from what has been said, that when a man's *money* is *invested* in a mining claim, or his "capital" is so "clothed" or "employed," he is the owner of "personal property" within the meaning of the Act which "declares" that the term "personal property," whenever used in that Act, shall be taken to include "all capital" loaned, invested or "employed in any trade, commerce, or business whatsoever."

But they say that this is an indirect mode of assessing the mining claim, and that the Act expressly exempts the claim. I admit the latter, but deny the former position.

The tax upon the business of mining, or the capital invested, is no more a direct tax upon the claim, than the tax upon the business of consigned goods is a tax *upon the goods*, or a license given to a foreigner to work in the mines, is an interference with the power of the General Government, to make rules and regulations respecting the territory of the United States; both of which points have been passed upon by this Court, in the case of the People *v.* Naglee, and the People *v.* Coleman, which I have cited. In fact, upon a review of those cases I find the distinction so clearly drawn below the exercise

State of California *v.* Moore.

of the power to tax a particular business, and that of an object with which such business is connected, as to render it unnecessary to dwell longer upon this point.

I submit, that if the language used in the Revenue Act will bear two constructions, then it is incumbent upon this Court to adopt that which will bring about an " equal and uniform operation" of the law, and compel each class of the community to contribute its quota toward the support of that Government from which it receives protection.

The argument in reference to first branch of the case, applies equally to the question of the tunnel valued at five hundred dollars.

The tunnel was an " improvement upon lands of the United States" owned by appellant, and was therefore " personal property " within the meaning of the Act. It should have been assessed at such sum as he *valued* it, or, if he refused to *value* it, then the law requires the Assessor to do so.  1 McCord's Rep., S. C., page 217.

TERRY, C. J., delivered the opinion of the Court—BALDWIN, J., and FIELD, J., concurring.

Defendant is the owner of a certain mining claim, for which he paid the sum of twenty thousand dollars, and upon which, since the purchase, he has expended the sum of five hundred dollars in opening a tunnel.

These sums were assessed against him, as money invested in the business of mining.  The object of this action is to test the legality of this assessment, and the questions presented are : 1st. Whether, under the Constitution, it is in the power of the Legislature to tax mining claims; and, 2d. Whether money invested in the purchase and opening of such claims, is within the provisions of that portion of the Revenue Act which provides for the levy of a tax on " all capital loaned, invested or employed in any trade, commerce or business whatsoever."

Upon the first of these propositions we entertain no doubt.  The only objection to the power of the Legislature to impose such a tax arises from the fact that the mines are the property of the Government, and are exempt from taxation under the Act admitting California into the Union.  This fact, however, if admitted, does not, in our view, militate against the right to levy a tax upon the interest of the possessor of such claim.  The whole course of legislation and judicial

decisions in this State, since its organization, has recognized a qualified ownership of the mines in private individuals.     Contracts affecting mining claims have been constantly enforced ; remedies have been afforded to those whose possession has been disturbed, or whose claims have been trespassed upon by others, and the right of the locator to sell, hypothecate, or in any manner dispose of his property in a mining claim, has been upheld, as well by legislative enactment as by judicial decisions.

In Tarter *v.* Spring Creek Company, 5 Cal. 395, the Court held that " the policy of this State, as derived from her Legislature, is to permit settlers, in all capacities, to occupy the public lands, and, by such occupation, to acquire the right of undisturbed enjoyment against all the world but the true owner."

In evidence of this, Acts have been passed to protect the possession of agricultural lands acquired by mere occupancy ; to license miners ; to provide for the recovery of mining claims, etc., " and that an appropriation of a portion of the public domain, or any of its incidents," establishes a *quasi* private proprietorship which entitles the holder to be protected in its quiet enjoyment.

In the Merced Mining Company *v.* Fremont, 7 Cal., we held that the possessor of a mining claim " by his appropriation acquires a vested interest in the exclusive occupation and enjoyment of the land as against all the world, subject only to the right of the Government by whose license and permission his possession was acquired; and his right to protect the property for the time being, is as full and perfect as if he were the tenant of the superior proprietor for year or for life ;" and in McKeon *v.* Bisbee, 9 Cal. 137, we held that the interest of the possessor of a mining claim was property under the law, and subject to be seized and sold under execution.

The Legislature recognized a proprietary interest in the possessor of mining claims by authorizing their hypothecation.    See Wood's Dig., page 108, art. 416.

The term " property in lands" is not confined to title in fee, but is sufficiently comprehensive to include any usufructuary interest, whether it be a leasehold or a mere right of possession.    Several persons may have, in the same land, a property which is subject to taxation, and it

is not perceived that the fact, that the property of the Government is exempt from taxation, affects the right to tax the interest which private individuals have acquired in the same property.   Exemption from taxation is a privilege of the Government, not an incident to the property.

In the hands of the Government, the lands are exempt, but the moment the title vests in a private individual, it becomes liable to the burthens which are imposed on other property of like character.  If the acquisition of the fee by a private person subjects the property to taxation, it follows that the acquisition of a lesser estate would equally subject such estate.

There is no force in the objection that the value of a mining claim, which depends upon the amount of precious metals it contains, must necessarily be left to conjecture.

The universal standard of value is the amount of money which can be realized by a sale of the property, and this will apply as well to mining claims as other lands.   Sales and hypothecations of mining claims are of every day's occurrence, and we apprehend their value can be ascertained with sufficient accuracy.

Upon the second proposition it is contended that though mining claims are by the statute expressly exempted from taxation, yet the money expended in their purchase and working is liable, as so much capital invested in the business of mining.

This rule would be manifestly unequal, and would in a large class of cases be productive of palpable injustice, hardship and oppression ; it would. exempt the first locator of a claim from taxation, while his vendee would be compelled to pay a percentage upon the purchase price, although the value of the claim at the date of the assessment might not be a tithe of the sum.   The claim may yield no return whatever ; may prove entirely valueless for any purpose ; yet the price paid would, under the rule contended for, be a *permanent* " investment of capital," and the party compelled to pay yearly a percentage on the amount.

Or take the case of a party who, after locating a claim, sells a moiety to another for a large sum, the interest of each is equally valuable and equally protected by the Government, yet one is required to contribute to the support of the Government in return for the benefits

afforded, while the other, who is in the enjoyment of the same benefits, contributes nothing.   We think a consequence so manifestly absurd, unjust and oppressive, was never intended by the Legislature.

We do not understand a sum paid for the purchase of specific property to be so much capital invested.   The mere purchase of property can in no just sense be said to be an investment of capital in the business for which the property is adapted or might be used.   The purchaser parts with all interest in the money paid ;  he has no longer any claim upon it;  and if the transaction constitute an investment of capital, the value of the property, and not the sum paid for it, is the amount of the " capital invested."   As well might the purchaser of a farm be required to pay taxes on the price paid as so much " capital invested in the business" of farming, as the purchaser of a mining claim upon the cost of such claim.

For the purposes of taxation there is no distinction between a thing and its value ; it is the value which is assessed, and upon which the tax is imposed, and an exemption of certain property from taxation exempts its value also.

Our conclusions are : 1st. That the interest of the occupant of a mining claim is property liable to be subjected, at the will of the Legislature, to such burthens as are imposed on other property.   2d. That the Legislature having expressly exempted mining claims from the operation of the Revenue Act, we cannot presume that it intended indirectly to subject them, by levying a tax on the price paid for them, which would, as we have shown, be a partial and unequal mode of ascertaining the value, and, in a majority of cases, be productive of great injustice.

It follows that the judgment of the Court below is erroneous, and it is reversed with costs. ·