[No. S016686. Feb. 27, 1992.]

ROBERT CONNOLLY et al., Plaintiffs and Respondents, v.
COUNTY OF ORANGE et al., Defendants and Appellants.

**COUNSEL**

Adrian Kuyper and Terry C. Andrus, County Counsel, and David R. Chaffee, Deputy County Counsel, for Defendants and Appellants.

De Witt W. Clinton, County Counsel (Los Angeles), Albert Ramseyer, Deputy County Counsel, Breon, O'Donnell, Miller, Brown & Dannis, Priscilla Brown and Marilyn J. Cleveland as Amici Curiae on behalf of Defendants and Appellants.

James E. Holst, Christine Helwick, Lloyd C. Lee and David N. Birnbaum for Plaintiffs and Respondents.

Crosby, Heafy, Roach & May and John E. Carne as Amici Curiae on behalf of Plaintiffs and Respondents.

## Opinion

BAXTER, J.—We are asked to decide whether article XIII, section 3, subdivisions (a) and/or (d) of the California Constitution[1] preclude imposition of an ad valorem tax on privately held leasehold interests in real property owned by the University of California and improved with homes owned and occupied by the university employees who hold the leases. Because appellate decisions have created uncertainty as to the tax status of these interests,[2] and similar properties comprise a significant part of the tax base of several local governments and school districts,[3] we address this question notwithstanding significant procedural issues that have arisen in the course of this litigation as a consequence of the manner in which plaintiffs have proceeded.

[1] All references to constitutional provisions are to the California Constitution. Article XIII provides in pertinent part: "Sec. 1. Unless otherwise provided by this Constitution or the laws of the United States:

"(a) All property is taxable and shall be assessed at the same percentage of fair market value. . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"Sec. 3. The following are exempt from property taxation:

"(a) Property owned by the State.

"(b) Property owned by a local government . . . .

"(c) Bonds issued by the State or a local government in the State.

"(d) Property used for libraries and museums that are free and open to the public and property used exclusively for public schools, community colleges, state colleges, and state universities.

" . . . . . . . . . . . . . . . . . . . . . . . . . . ."

[2] Cf. *Mann* v. *County of Alameda* (1978) 85 Cal.App.3d 505 [149 Cal.Rptr. 552], and *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226 [138 Cal.Rptr. 634].

[3] The Palo Alto Unified School District, which has appeared as amicus curiae in this matter, states that a significant part of its funding is derived from taxes on the possessory interests of employees of Stanford University who lease the land on which their homes are located from that institution. Some 856 faculty and staff residences are located on property owned by Stanford University.

The exemption on which Stanford University and its employees presumably would rely, however, is that found in article XIII, section 3, subdivision (e). That provision exempts

We conclude that plaintiffs are not entitled to the tax exemption they seek. Although leasehold interests in university property may be property that is exempt from taxation under the exemption afforded by article XIII, section 3, subdivision (d) (section 3(d)), when a lessee of university property uses that property as a site for a privately owned residence, the property is not "used exclusively for public schools, community colleges, state colleges, and state universities" as required by section 3(d).

I

PROCEDURAL/JURISDICTIONAL ISSUES

A. *Trial Court.*

Plaintiffs are the Regents of the University of California (Regents); the Irvine Campus Housing Authority (ICHA), a nonprofit corporation associated with the Irvine campus of the university; and Robert Connolly. Connolly is a professor employed at the Irvine campus who sued on behalf of himself and other similarly situated owners of homes constructed by the ICHA in the University Hills faculty housing project on land owned by the university and leased to the homeowners. Plaintiffs initiated this action in the Orange County Superior Court by a pleading styled as a petition for writ of mandate or in the alternative a complaint for declaratory relief, naming only the County of Orange (County) as defendant.

The petition/complaint alleged that County had refused to exempt the possessory interests of some 260 individual homeowners from property taxes. Plaintiffs sought in the first count, identified as a petition for writ of mandate, to have the homeowners' possessory interests in the land underlying the homes exempted from local property tax. In the second count, identified as a complaint for declaratory relief, plaintiffs claimed that the possessory interests in the land underlying the homes were exempt from property tax, but sought a declaration with respect to the possessory interests in the homes.[4] In each count they relied on section 3(d).

"[b]uildings, land, equipment, and securities used exclusively for educational purposes by a nonprofit institution of higher education." (See also art. XX, § 2.)

[4]It is not clear whether plaintiffs intended this distinction. The trial court ruled only on leasehold interests identified in the count labeled as one for mandamus. The status of the count seeking declaratory relief as to the interests in the homes is unclear. The trial court did not issue or direct issuance of an alternative writ (see Code Civ. Proc., § 1087) and defendant both demurred and answered (see Code Civ. Proc., §§ 1089, 430.10). The trial court ultimately granted a nonstatutory "motion for issuance of a writ," rather than granting the petition for writ of mandate. The trial court and parties apparently equated the motion to one for

County's demurrer, urging the bar of Revenue and Taxation Code section 4807,[5] was overruled. County then answered, admitting that plaintiff Connolly's property had been assessed, but asserting as affirmative defenses the failure of plaintiffs to claim either an exemption or a refund, the failure to exhaust administrative remedies, and the exclusive remedy of payment followed by an action for a refund. (See Rev. & Tax. Code, § 5140 et seq.)

After denying a motion for summary judgment by County, and soliciting amendment of the petition/complaint to narrow the class, and after plaintiffs agreed to seek summary judgment only on behalf of Connolly, the trial court granted plaintiffs' "motion for issuance of a writ" as to plaintiff Connolly only and limited to exempting his "leasehold" interest from taxation, conditioned on his filing an amended claim for exemption with the county assessor. County appealed. The parties then stipulated to entry of judgment directing County to grant a property tax exemption for some 200 class members on their possessory interests in the land underlying the homes they owned upon their submission of claims for exemption and identification of the claimant as a full-time employee of the university. County appealed from this judgment. The appeals were consolidated in the Court of Appeal.

■ Although a consent or stipulated judgment is not normally appealable, an exception is recognized when "consent was merely given to facilitate an appeal following adverse determination of a critical issue." (*Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 817 [226 Cal.Rptr. 81, 718 P.2d 68].)

Additional issues as to the propriety of this appeal arise, however, as a result of the manner in which the judgments were rendered. Arguably the order granting relief to Connolly was appealable even though it did not dispose of the class for whom relief was sought in the same cause of action (see *Aetna Cas. etc. Co.* v. *Pacific Gas & Elec. Co.* (1953) 41 Cal.2d 785 [264 P.2d 5, 41 A.L.R.2d 1037]) since he and the class could be considered different parties. The practice is highly questionable since that left no party representing the class which had been certified. However, because the court

summary judgment, although Code of Civil Procedure section 1094 expressly provides for determination of writ petitions raising only legal issues.

We infer that the court elected to treat the action solely as a petition for writ of mandate. Therefore, no issue with respect to the taxability of the homes themselves is before us. Counsel for plaintiffs acknowledged at oral argument that plaintiffs are not now seeking a determination of the tax status of the homes.

[5]Revenue and Taxation Code section 4807: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected."

failed to enter judgment dismissing the second cause of action, the appeals from each judgment did not fall within recognized exceptions to the one final judgment rule. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 43, p. 66.) Nonetheless, the two judgments that were rendered disposed of all of the issues between the parties. Arguably, therefore, the Court of Appeal had jurisdiction if we deem the second count of the petition/complaint as having been dismissed. (See *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122]; *Wilson* v. *Sharp* (1954) 42 Cal.2d 675, 677 [268 P.2d 1062]. But see *Cohen* v. *Equitable Life Assurance Society* (1987) 196 Cal.App.3d 669 [242 Cal.Rptr. 84].)

These procedures and rulings do, however, give rise to questions of appellate jurisdiction similar to those which troubled the Court of Appeal in *Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 178-179 [215 Cal.Rptr. 881]. We join the *Cohen* v. *Equitable Life Assurance Society, supra,* 196 Cal.App.3d 669, panel in emphasizing that procedural irregularities of this kind in the trial court often make appellate jurisdiction questionable.[6]

B. *Court of Appeal.*

County did not address the exemption issue in its briefs in the Court of Appeal, relying instead on a challenge to the jurisdiction of the trial court to issue a writ of mandamus directed to County which, it argued, had no duty to grant exemptions from real property taxation. County also argued that mandate did not lie because no present duty to perform the act (granting exemptions) existed; because granting exemptions was a discretionary act not subject to judicial compulsion by mandate; and because plaintiffs had a plain, speedy, and adequate remedy at law making resort to mandate unnecessary. Finally, County again raised the failure of the homeowner plaintiffs to exhaust administrative remedies as a bar to relief.

The Court of Appeal gave greater recognition to the jurisdictional and procedural impediments to issuance of a writ of mandate than did the trial court, and reversed the judgment. It was equally determined to resolve the exemption question, however, and purported to do so in an opinion which simultaneously recognized that mandate could not issue against County and

---

[6]After deeming an order sustaining a demurrer to incorporate a judgment of dismissal, in order to treat the notice of appeal as one from the judgment of dismissal, the Court of Appeal expressed unwillingness to mount future rescue missions, stating, "[W]e hereby give notice to the bar that henceforth we will no longer bail out attorneys who ignore the statutory limitations on appealable orders." (*Cohen* v. *Equitable Life Assurance Society, supra,* 196 Cal.App.3d 669, 671.)

that the Assessor of the County of Orange, who would have been the proper respondent, had not been named as a party to the action.[7]

The Court of Appeal held that plaintiffs were not entitled to mandamus, noting the preemptive effect of Revenue and Taxation Code section 4807: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceedings in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected."

The court also held that plaintiffs had sued the wrong party since it is the assessor of a county who has the duty to perform the acts sought to be mandated by plaintiffs. ██ ██ The court recognized that Code of Civil Procedure section 1085 authorizes issuance of the writ "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; . . ." and it will not lie if the named respondent has no duty to perform the act.[8] ██ The duties of the assessor are established by statute. (Rev. & Tax. Code, § 401 et seq.) As a county officer, the assessor is subject to supervision by the board of supervisors of the county (Gov. Code, § 25303), but the county may not be compelled to perform the duties of the office.[9] The assessor is, therefore, a necessary party. (*Peck* v. *Board of Supervisors* (1891) 90 Cal. 384, 385-386 [27 P. 301]. See also Code Civ. Proc., § 389.)

Finally, the Court of Appeal held, even the assessor had no present duty to grant an exemption because Connolly had not filed a timely claim for exemption, and, in any case, issuance of an extraordinary writ was unnecessary because the homeowner plaintiffs had an adequate remedy at law by

---

[7]Although County limited the issues in its briefs to the jurisdictional and procedural issues, and had not briefed the merits of the exemption question, the Court of Appeal justified its decision to address that question by reasoning that County raised it by arguing that granting an exemption was a discretionary decision.

[8]The Court of Appeal considered this defect as one reflecting failure of the complaint to state a cause of action which, although properly the object of a demurrer, could be raised on appeal pursuant to Code of Civil Procedure section 430.80, subdivision (a). Because the writ may issue only to a person with a duty to perform the mandated act, the trial court exceeded its jurisdiction in granting one here. The jurisdictional claim is also one which may be raised on appeal. (*Ibid.*)

[9]The office of county assessor is elective. (Art. XI, §§ 1, subd. (b), 4, subd. (c); Elec. Code, § 33; Gov. Code, § 24000.) The supervisory authority of the board of supervisors is thus limited to ensuring that the assessor faithfully performs the duties of the office, and does not permit the board to control, directly or indirectly, the manner in which the duties are performed. (*Hicks* v. *Board of Supervisors* (1977) 69 Cal.App.3d 228, 242 [138 Cal.Rptr. 101]. See also *People* v. *Langdon* (1976) 54 Cal.App.3d 384, 388-389 [126 Cal.Rptr. 575].)

which to obtain relief. Revenue and Taxation Code sections 5096 et seq.[10] and 5140[11] created those remedies.

The Court of Appeal therefore reversed the judgment of the trial court and ordered that the petition for extraordinary relief be denied. Before doing so, however, the court also addressed the plaintiffs' argument that they were entitled to a tax exemption, and concluded their possessory interests were exempt from property taxation pursuant to section 3(d).

County and plaintiffs petitioned for review. Plaintiffs seek to establish the Regents' standing as a proper party to the litigation and thereby to establish the propriety of prepayment litigation by petition for writ of mandate. County again asserts the procedural and jurisdictional issues. County's petition for review was granted.

■ We agree in all respects with the Court of Appeal's holding that Revenue and Taxation Code section 4807 is a bar to this action. That section creates a statutory bar to orders enjoining the collection of a county tax which is comparable to the constitutional prohibition against enjoining the collection of a state-imposed tax. (See art. XIII, § 32; *Western Oil & Gas Assn.* v. *State Bd. of Equalization* (1987) 44 Cal.3d 208, 213 [242 Cal.Rptr. 334, 745 P.2d 1360].)

The Regents argue that the university has an interest in the resolution of the exemption issue, but cannot itself comply with the statutory and administrative procedures. Therefore, they reason, the Regents have standing to participate in this litigation, and mandate is the only procedural avenue by which they can obtain a judicial resolution of the issue.

The statutory command is clear and admits of no exceptions, however. A court may not by mandate or other process enjoin the collection of a tax. Although decided in the context of the constitutional bar of article XIII, section 32, *Western Oil & Gas Assn.* v. *State Bd. of Equalization, supra,* 44 Cal.3d 208, 213, and the authorities on which that opinion rests are equally controlling here. Revenue and Taxation Code section 4807 applies because, regardless of the identity of the plaintiff, a judicial determination that section 3(d) exempts property from taxation impedes the collection of a tax. (See also Rev. & Tax. Code, § 19081.)

---

[10]Revenue and Taxation Code sections 5096 and 5097 provide for a refund, on order of the board of supervisors, of taxes erroneously or illegally collected, or illegally assessed or levied, and establish a claims procedure.

[11]Revenue and Taxation Code section 5140 and succeeding sections authorize and establish procedures for a legal action to recover taxes when the board of supervisors has denied a claim.

Nor is there merit in the Regents' argument that the statutory bar precludes resolution of important issues of constitutional and statutory construction. Directly affected taxpayers and potential plaintiffs have standing to seek exemptions or refunds, and to institute litigation if their claims are denied. Other parties who can establish sufficient interest in the subject matter may intervene (Code Civ. Proc., § 387; *People* v. *Superior Court (Good)* (1976) 17 Cal.3d 732, 736-737 [131 Cal.Rptr. 800, 552 P.2d 760]; *County of San Bernardino* v. *Harsh California Corp.* (1959) 52 Cal.2d 341 [340 P.2d 617]) or participate as amicus curiae (Cal. Rules of Court, rule 14(b)) in actions which taxpayers initiate. A nontaxpayer's interest in the subject matter does not remove the litigation from the bar of Revenue and Taxation Code section 4807, however.

We also agree with the Court of Appeal's conclusions that mandate does not lie because neither County nor the assessor has a present duty to grant an exemption, no timely claim for such having been filed. And, for the reasons discussed, we agree that County may not be ordered to grant an exemption, that duty, when it exists, being one that the assessor must perform. Revenue and Taxation Code section 401 imposes on the assessor the duty of assessing "all property subject to general property taxation . . . ." Section 3(d) and Revenue and Taxation Code sections 201 and 203, which make all property taxable unless subject to an exemption, and implement the constitutional exemption at issue here, thus impose on the assessor of each county the duty to determine in the first instance whether an exemption applies. (See also, Rev. & Tax. Code, § 270 et seq.)

For those reasons, the Court of Appeal properly reversed the judgment of the trial court.

Nonetheless, because the Court of Appeal purported to decide the merits of the exemption question in a proceeding to which the assessor was not a party and in which the issues had not been fully briefed, in an opinion which that court appeared to believe would be binding in future proceedings, this court felt compelled to grant review.

## II

### EXEMPTION

Because of the importance of the questions presented in this matter to taxing agencies, local government, and school districts, and the individual and institutions whose property interests may be subject to taxation, affirmance of the judgment of the Court of Appeal by this court in an opinion

which simply disapproved as dicta the Court of Appeal's conclusions regarding exemptions would not serve the interests of the parties or the public. Therefore, by stipulation of the parties, we have permitted the Orange County Assessor (Assessor) to intervene as a defendant and appellant. Full opportunity for briefing the exemption question has been provided. Consequently, the defect in failing to name the Assessor as a party is no longer an impediment to addressing the merits of the claim that the leasehold interests are exempt from taxation. County and the Assessor have not waived the protection of Revenue and Taxation Code section 4807, or the procedural defenses heretofore asserted, however. While the petition for writ of mandate must be denied, we may now address the question of the scope of the exemptions granted by section 3(a) of article XIII (section 3(a)) and section 3(d). (Cf. *Sherman* v. *Quinn* (1948) 31 Cal.2d 661, 664-665 [192 P.2d 17].)

A. *The Possessory Interests at Issue.*

We emphasize at the outset that the tax exempt status of the interest of the University of California (University) in property it owns or leases from others is not at issue in this case. There is no dispute that taxes may not be imposed on property held by the University or on its reversionary interest in property it has leased to others. The exemption issue here relates only to leasehold interests in University property held by private parties, and the only question is whether the lessees (not the University) must pay taxes imposed on their possessory interests.[12]

Plaintiff Connolly and the class he seeks to represent are employees of the University of California, Irvine, who hold ground leases for parcels in the University Hills faculty housing project on the Irvine campus. They have purchased or constructed homes on their leased parcels. The land is owned by the University and has been leased to ICHA on a 99-year ground lease. ICHA has, in turn, subleased lots in the project to the approximately 260 class members for a period terminating in the year 2082. These sublessees hold title to the improvements on their lots—single-family residences, townhouses, and condominiums. Since the litigation commenced, the number of homes in the project has increased to over 400.

The homeowners pay a monthly rental for their interest in the ground sublease held by ICHA, computed as a fixed percentage of the imputed land value with adjustments made every five years. They also pay assessments for common space and condominium maintenance. Homeowners may assign

---

[12]The Assessor concedes that if the University leased land to be improved by the lessee under a leaseback arrangement with the University, the University could not be taxed on either its reversionary interest or the interest it reacquired under the leaseback.

their interest in the subleased property as security to a lender pursuant to a deed of trust, and may sell the improvements and assign their interest in the sublease to the purchaser. However, the resale price of the homes may not exceed the sum of the purchase price, capital improvements, and a replacement cost index factor, and the University retains the right to repurchase if the owner's employment is terminated or the property will devolve to or be purchased by a person not associated with the University. The owner must occupy the property as the principal place of residence, and may continue to occupy the property as long as he or she is employed full time by the University. He or she may also remain after retirement or while on sabbatical leave. The surviving spouse of a deceased employee may continue to occupy the property, and owners may sublease for up to two years.

B. *The Exemption Claim.*

██ Plaintiffs contend that the homeowners' possessory interests in the land owned by the University are exempted from property taxation by section 3(d) because their occupancy of residences in the University Hills housing project is "reasonably necessary for the fulfillment of a generally recognized function of a complete modern college," i.e., the use to which the University has put this land—faculty and staff housing—is necessary to the educational purpose of the University.

The Assessor concedes that *a* purpose for the development was to provide affordable housing for faculty members and that some of the plaintiff class may have accepted employment at the Irvine campus only because the ICHA housing was both affordable and convenient.[13] He argues, however: (1) section 3(a), not section 3(d), governs property owned by the University and does not exempt privately held possessory interests in that property; (2) even if section 3(d) is applicable, it does not exempt these privately held possessory interests; and (3) the property sought to be taxed does not qualify for exemption in any case because it is not used exclusively for a university purpose.

C. *Application of Section 3(a) and Section 3(d).*

Plaintiffs do not question the applicability of the general tax law to private possessory interests in real property owned by an entity that is itself exempt,

---

[13]Homes in the project have been sold at prices which range from 50 percent to 80 percent of the fair market value for comparable homes located off the Irvine campus. The location of the homes makes it possible for the owners to avoid commuting. One homeowner devotes the time saved to University endeavors, and also conducts seminars, tutorials, and student gatherings in the on-campus home. Plaintiff Connolly does not make such use of his home, however.

nor could they. ■ " 'Possessory interests' in 'land or improvements' are taxable under section 107 of the Revenue and Taxation Code and in pursuance of the constitutional mandate that 'all property . . . shall be taxed.' (Const., art. XIII, § 1.)" (*Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 618 [184 P.2d 879].) Privately held possessory interests in property owned by the federal government, the state, and municipalities are subject to taxation. (*Kaiser Co.* v. *Reid, supra,* 30 Cal.2d 610, 618.) Because a large proportion of California land was (and is) in public ownership, taxation of possessory interests is an important source of local government revenue. (*County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445 [262 Cal.Rptr. 439]; *Freeman* v. *County of Fresno* (1981) 126 Cal.App.3d 459 [178 Cal.Rptr. 764].)

The justification for the practice of taxing private possessory interests in public property was explained in *Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55 [338 P.2d 440], in which we explicitly rejected the theory that the benefit of tax exemption could be extended to possessory interests in tax exempt public property:

"When the city leases its land, . . . it does not merely use it. It creates valuable privately-held possessory interests, and there is no reason why the owners of such interests should not pay taxes on them just as lessees of private property do through increased rents. Their use is not public, but private, and as such should carry its share of the tax burden. Moreover, *the city does not lose its tax exemption by leasing its land.* The reversion is not taxed, for it is only the value of the use for the unexpired term of the lease that is assessed. Thus, whereas lessees of private property indirectly pay taxes through increased rent on the full value of the land including the lessor's reversion, the city's lessees pay taxes only on the value of the possessory interests granted to them by the city. The city retains the full benefit of its tax exemption on the interest it has retained. . . . [T]he city is not entitled to a competitive advantage over private lessors when it sells . . . interests carved out of the public domain. *Of course the city would be able to charge higher rents if it could extend the mantle of its tax exemption over the private interests it creates in its lands, but since it is only its own property that is tax exempt, it is not entitled to that advantage.*" (*Texas Co.* v. *County of Los Angeles, supra,* 52 Cal.2d 55, 63. Italics added.)

The rule must be the same with respect to the property of public schools and colleges since the history of section 3(d) does not reflect an intent that private parties who lease property from a public school receive a benefit not given to persons who lease property from the federal, state, or local

government. Since section 3(a) does not exempt the leasehold interests in issue here from the burden of taxation, we must determine whether the interests are exempt under section 3(d).[14]

### 1. *Constitutional History.*

The exemption of state property and public school property from taxation predates the adoption of the Constitution of 1879 which, in former section 1 of article XIII, created an express exemption for "growing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State."

The Constitution of 1849 had addressed taxation only in former section 13 of its article XI. That section provided: "Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law; but Assessors and Collectors of town, county, and State taxes, shall be elected by the qualified electors of the district, county, or town, in which the property taxed for State, county, or town purposes is situated." Although the Legislature had no power under the 1849 Constitution to create exemptions from the command that all property in the state be taxed, property owned by a governmental entity was deemed exempt under the Constitution notwithstanding the absence of an express exemption provision. (*People* v. *McCreery* (1868) 34 Cal. 432, 452.)

In *McCreery*, this court considered the validity of the General Revenue Act of 1857, as amended in 1859 (Stats. 1859, p. 343) which purported to exempt from taxation not only property of the state, counties, and municipal corporations, but also that of "colleges, school houses, and other buildings for the purpose of education, public hospitals, asylums, poor houses and other charitable institutions for the relief of the indigent and afflicted, churches, chapels and other buildings for religious worship, together with

---

[14]Revenue and Taxation Code section 202, subdivision (a)(3) and (4), implements section 3(a) and (d) of article XIII by providing statutory exemptions for "[p]roperty used exclusively for public schools, community colleges, state colleges, and state universities, including the University of California" and "[p]roperty belonging to this state."

Specific reference to property owned by the University was added to subdivision (a)(3) of this statute in a 1978 amendment. (Stats. 1978, ch. 936, p. 2911, § 1.) We do not consider the statutory exemptions separately since the Legislature may not grant an exemption from property taxation unless authorized to do so by the Constitution (art. XIII, § 1; *Crocker* v. *Scott* (1906) 149 Cal. 575 [87 P. 102]), and has not attempted to do so here. Only those statutory exemptions authorized by section 4 of article XIII, which specifies those types of property which "[t]he Legislature may exempt from property taxation" are purely statutory. Therefore, the scope of the exemptions provided for in Revenue and Taxation Code section 202, subdivision (a)(3) and (4), is no broader than those authorized by section 3(a) and (d) of article XIII.

lots or ground and other property appurtenant thereto; cemeteries and grave-yards; the property of widows and orphan children to the amount of one thousand dollars; growing crops and mining claims." The court invalidated the exemption because "so far as it includes private property" it violated the Constitution. (*People* v. *McCreery, supra*, 34 Cal. at p. 457.) Having done so, the court stated that it had become the duty of assessors to assess all property in their districts that was subject to taxation with the exception of property owned by a public entity: "This comprehends all property except that which may be denominated, generally, public property." (*Id.* at p. 458.) Property of a public school owned by a governmental unit was, therefore, exempt under the general exemption of property of the state and municipal corporations.

This understanding existed when the 1879 Constitution was adopted. Political Code section 3607 then provided that "[a]ll property within this State, except the property of the United States, of the State, and of municipal corporations, is subject to taxation."

At the time the Constitution of 1879 was adopted, it also was clear that privately held interests in otherwise exempt property owned by the govern-ment were subject to the constitutional command that all property be taxed. (See *People* v. *B. D. C. M. Co.* (1869) 37 Cal. 54; *People* v. *Crockett* (1867) 33 Cal. 150; *People* v. *Cohen* (1866) 31 Cal. 210; *People* v. *Shearer* (1866) 30 Cal. 645; *State of California* v. *Moore* (1859) 12 Cal. 56.)

That principle, which endures today, was expressed in the earliest of these cases, *State of California* v. *Moore, supra*, 12 Cal. 56, in which taxation of an individual's interest in a mining claim located on land owned by the United States was in issue. This court explained: "The term 'property in lands' is not confined to title in fee, but is sufficiently comprehensive to include any usufructuary interest, whether it be a leasehold or a mere right of possession. Several persons may have, in the same land, a property which is subject to taxation, and it is not perceived that the fact, that the property of the Government is exempt from taxation, affects the right to tax the interest which private individuals have acquired in the same property. Exemption from taxation is a privilege of the Government not an incident to the property.

"In the hands of the Government, the lands are exempt, but the moment the title vests in a private individual, it becomes liable to the burthens which are imposed on other property of like character. If the acquisition of the fee by a private person subjects the property to taxation, it follows that the acquisition of a lesser estate would equally subject such estate." (*State of California* v. *Moore, supra*, 12 Cal. at pp. 70-71.)

An express exemption for property *used* for public schools first appeared in former section 1, of article XIII of the 1879 Constitution. That section provided that: "[G]rowing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State shall be exempt from taxation . . . ."

The draft of article XIII submitted to the delegates at the 1879 constitutional convention by the Committee on Revenue and Taxation had not proposed an express exemption of property used for public schools.[15] The draft article which the Committee on Revenue and Taxation recommended to the convention included only an exemption for property *owned* by a governmental entity. It provided in former section 2: "All property, including franchises, capital stock of corporations or joint stock associations, and solvent debts, deducting therefrom debts due to bona fide residents of the State, and excluding growing crops, private property exempt from taxation under the laws of the United States, public property belonging to the United States, or to this State, or any municipality thereof, and all property and the proceeds thereof which is used exclusively. [*Sic.*]"

The history suggests that the delegates did not believe that an exemption was necessary for schools which were owned by a unit of government. During the debate on the proposed article, Judge Hale, a delegate, proposed an amendment which would have added to the exemptions debts and evidences of debt, and delegate Huestis then proposed a substitute for the Hale amendment. The Huestis substitute proposed to expressly exempt property in a school district that was "devoted to public use." The proposed amendment read in pertinent part: "All property in this State, including franchises, capital stock of corporations or joint stock associations, and solvent debts, excepting growing crops, private property exempt from taxation under the laws of the United States, public property belonging to the United States, or to this State, or any county, city and county, city, or municipality thereof, and including all property, real and personal, belonging to and devoted to public use in all public school districts and departments in this State, shall be taxed in proportion to its cash value . . . ." (2 Debates, *supra*, at p. 845.)

Although the article on Revenue and Taxation was possibly the most extensively debated article, and questions regarding taxation were said to be the underlying impetus for the convention (see, e.g., remarks of Mr. Belcher, 2 Debates, *supra*, at p. 848; remarks of Mr. Steele, *id.* at p. 852; remarks of

---

[15]See 1 Debates and Proceedings of the Constitutional Convention of 1879 (hereafter Debates) page 450.

Mr. Moreland, *id.* at p. 863),[16] neither the remarks of Mr. Heustis, nor those of other delegates who participated in the debate on proposed amendments to the draft, addressed the reason for addition of property used for public schools to the designated exemptions. Mr. Edgerton said that he understood the intent of the author "to express this idea: that all property devoted to public use, that is for school purposes, should be exempt. . . . But it might include the property of a railroad, a quasi-public corporation." (*Id.* at p. 849.) This remark, referring to property devoted to public use, as opposed to property publicly owned which was already exempt, suggests that the intent of the convention was to create a new exemption for property a public school was using, but did not own. Delegate Johnson's later proposal to simplify what was by then section 1 by, inter alia, eliminating the express exemption of "property used exclusively for public schools" was rejected, even though he suggested that the words were unnecessary because the property was already exempt as property belonging to the state or a municipality. (3 Debates, *supra*, at p. 1463.) This rejection also supports a conclusion that the choice of language—"property used exclusively for public schools"—was deliberate, and was intended to create an exemption for property which the government did not own but used for public school purposes.

Although the exemption provisions were not debated extensively, the reason for the exemption of property owned by a governmental unit is clear. The delegates' purpose was to ensure that all property in the state was taxed, and to avoid inequities under the existing system. It made no sense to include publicly owned property in the scheme, however, since the state would have to use tax money to pay taxes on its property. Delegate Edgerton expressed that understanding during the debate on second reading of the article on Revenue and Taxation. He had proposed to limit the exemption of publicly owned property from taxation if the property was owned by one county, but located in a second county: "The State does not tax its own property, because that would simply be taking money out of one pocket and putting it into another." (3 Debates, *supra*, at p. 1463.)

Subsequent debate centered on the Edgerton and other proposals, all of which were voted down. The express exemption for property used for public

---

[16]Mr. Moreland stated an opinion which reflected the views of several delegates: "Why was this Convention called . . . . Because the Supreme Court of this State has decided that bonds and notes and mortgages are not property, and therefore not subject to taxation under our present Constitution. That is the great, the moving reason, the people of this State had in mind when they ordered this Convention." (*Id.* at p. 863.)

Mr. McFarland, however, had "heard more reasons assigned for the calling of the Convention than the college students give for the downfall of Rome." He believed the people had no intention of calling a convention, but had been manipulated. He nonetheless agreed that taxation was a matter of great interest. (*Id.* at p. 862.)

schools, which is now found in section 3(d), remained part of the Constitution as adopted by the Constitutional Convention,[17] but no exemption for property owned or used by the University or any other public institution of higher learning was included.[18] Because property owned by the state, local government, and entities thereof, was exempt, however, no express exemption was necessary to relieve the University of the burden of taxation on property which it owned. Even in the absence of an express exemption for property owned by the University, the court has repeatedly recognized its exempt status as property of the state. (See *Webster* v. *Board of Regents* (1912) 163 Cal. 705 [126 P. 974]; *Henne* v. *Los Angeles County* (1900) 129 Cal. 297 [61 P. 1081]; *People* v. *Board of Supervisors* (1888) 77 Cal. 136, 19 P. 257; *Hollister* v. *Sherman* (1883) 63 Cal. 38.)

Since other governmentally owned property was also exempt, the inclusion in the 1879 Constitution of an express exemption of "property used exclusively for public schools" necessarily had another purpose. That purpose was to create a new exemption, one for property "used for," but not "owned by" a public school.

In *Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258 [148 P.2d 649], this court considered the history of section 3(d) and reached that conclusion. "Section 1 of article XIII was in the original Constitution adopted in 1879. This section was readopted with certain amendments in 1894, 1910, and 1914, but the provision exempting property used exclusively for public schools from taxation was retained without any change whatever. Subsequently section 1½ of article XIII, exempting church property from taxation, was adopted in 1900, and section 1½a, exempting orphanages, was adopted in 1920. Each of these subsequently adopted sections expressly provides that no property 'so used' which may be rented and the rent received by the owner therefor shall be exempt from taxation. . . . [¶] Evidently the framers

---

[17]Article XIII, former section 1, read in its entirety: "All property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law. The word 'property,' as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership; provided, that growing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State, shall be exempt from taxation. The Legislature may provide, except in the case of credits secured by mortgage or trust deed, for a deduction from credits of debts due to bona fide residents of this State."

[18]"Public schools" referred only to the system of common schools and did not include the University. As originally worded, former section 6 of article IX specified: "The public school system shall include primary and grammar schools, and such high schools, evening schools, normal schools, and technical schools as may be established by the Legislature, or by municipal or district authority; . . ." The University was separately treated in section 9 of article IX.

of the Constitution in making the exception in favor of property used exclusively for public school purposes had in mind the great benefits derived from our educational institutions and desired to relieve them from the burden of taxation. The history of this state shows that it has been the steadfast policy of the people of the state to encourage in every possible way the cause of education. *The exemption of property used for public school purposes is* not for the benefit of the private owner who may rent his property for said purpose, but *for the advantage of the school district that may be compelled to rent property* rather than to buy land and erect buildings thereon to be used for the maintenance of its school. *With this advantage the school district is able to rent property for a lower rental than the owner of the same property would be willing to accept from a private individual, for the reason that if rented to a school district the owner is relieved from the payment of taxes thereon.*" (24 Cal.2d at pp. 262-263. Italics added. See also, *Regents of University of California* v. *State Bd. of Equalization* (1977) 73 Cal.App.3d 660, 666 [140 Cal.Rptr. 857] ["The purpose of the exemption here is to obtain lower rentals for the educational institutions."].[19])

Property of public educational institutions of collegiate level "used exclusively for" that purpose was added to the public school exemption when the Constitution was revised in 1974 and section 3(d) replaced that part of former section 1 of article XIII. Neither the analysis of the measure by the Legislative Analyst nor the ballot arguments indicate an intent to change either the established purpose of the exemption as it applied to public schools or the meaning of the phrase "used exclusively for."[20]

The history of the public school exemption thus confirms that the exemption was created to afford relief from tax to owners who were not entitled to a governmental exemption on property that was being used for public schools, community and state colleges, state universities, libraries, and museums. By relieving the owner of the expense of taxes on that property, the exemption indirectly benefits the beneficiaries of these institutions by reducing the expense of providing services to the public.

---

[19]As that case reveals, the purpose is not always fulfilled. (73 Cal.App.3d 660, 670-671. See now Rev. & Tax. Code, § 202.2.)

[20]The Legislative Analyst stated that the provision "deletes obsolete provisions, clarifies wording, eliminates excess verbiage, and establishes a logical order for the article's provisions." The Legislative Analyst also identified several changes in the Constitution, but made no reference to the substance of section 3(d). (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974), analysis of Prop. 8 by Legislative Analyst, p. 30.)

The argument by the Chairman of the Constitutional Revision Commission explained the purpose of the amendment was "not to make a change in our present tax structure, but to make the Constitution more readable and workable." (*Id.*, Argument in Favor of Prop. 8, p. 31.)

■ While this history indicates that the exemption was adopted with leasing of private property to a school in mind, the language of section 3(d) does not limit the exemption to fee interests. It extends the exemption to "property" without limitation. The purpose of the exemption—to encourage property owners to make their property available to a public school—is served regardless of whether the property is a fee interest or a leasehold interest. Therefore, because leasehold interests are also "property," they, too, may be exempt if the holder of the lease uses the property exclusively for school purposes within the meaning of section 3(d).

### 2. *Exclusive Use.*

■ As explained in *Ross* v. *City of Long Beach, supra,* 24 Cal.2d 258, 262-263, the phrase "used exclusively for public schools, community colleges, state colleges, and state universities" serves to limit taxation of privately owned property when used by public educational institutions, extending to the owners of that property the benefit of the same exemption as the institutions themselves enjoy. The section has no effect on the tax status of private possessory interests in property owned by the schools and colleges unless the holders of those interests, like the owners of fee interests, are using, or permitting the public school or college to use, the property for school purposes.

The Court of Appeal has considered whether property is used "exclusively for" an exempt purpose in the context of residential use in two cases in which the court concluded that the possessory interests are not taxable.

The first decision, *English* v. *County of Alameda, supra,* 70 Cal.App.3d 226, did not involve the exemption granted by section 3(d). In *English,* mandate was sought to compel the assessors of the defendant counties to tax the possessory interests of occupants of properties owned by private non-profit educational and charitable institutions which qualified for exemption from taxation under sections 3, subdivision (e) (section 3(e)) and 4, subdivision (b) (section 4(b)) of article XIII only if their property was used "exclusively for" educational purposes under the former or religious, hospital or charitable purposes under the latter provision.[21]

The properties in issue in *English* were occupied by employees and beneficiaries of the institutions who owned them. The occupants were

---

[21]Section 3(e) exempts "[b]uildings, land, equipment, and securities used exclusively for educational purposes by a nonprofit institution of higher education."

Section 4(b) exempts "[p]roperty used exclusively for religious, hospital, or charitable purposes and owned or held in trust by corporations or other entities (1) that are organized and operating for these purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual."

hospital and college administrators, professors, doctors, nurses, and aged persons. Construing and applying section 3(e) and section 4(b), not section 3(d), the Court of Appeal concluded that because a possessory interest in the property was "a part or ingredient of the property," the plain meaning of the exemption for the school and welfare properties necessarily included the possessory interests held by private parties. (*English* v. *County of Alameda*, *supra*, 70 Cal.App.3d 226, 235.)

The *English* court then considered the uses to which the properties claiming the welfare exemption were being put by the institutions which owned them and held that the occupants' possessory interests were tax exempt because the use was reasonably necessary to the accomplishment of the purpose of the institutions which owned the property. "[E]ven if the use of certain property is only incidental or reasonably necessary to attain the charitable goal and, therefore, at least in the every day sense of the word, does not foreclose some additional or complementary use on the part of certain authorized private individuals, . . . *for the purpose of property taxation* such incidental or reasonably necessary use must be and is considered as an exclusive use which calls for exemption from ad valorem taxation both under the Constitution and the statute." (*English* v. *County of Alameda*, *supra*, 70 Cal.App.3d at pp. 236-237. Italics in original.)

The *English* court reasoned that providing housing was within the purposes for which the schools and charities were formed. Since these tax exemptions were created to encourage charitable institutions to provide services which would otherwise have to be provided at public expense, the recipients of the benefits were entitled to the exemption. "[T]he tax exemption granted to charitable organizations is provided not only for the well-being of the immediate beneficiaries of the institutions (e.g., elderly persons in homes for the aging; occupiers of student and faculty residences and dormitories on college campuses; patients of hospitals), but also for the benefit of the public at large . . . . '*The fundamental basis for all exemptions in favor of charitable institutions is the benefit conferred by them on the public* and the consequent relief of the burden on the state to care for and advance the interests of its citizens.' " (*English* v. *County of Alameda*, *supra*, 70 Cal.App.3d at p. 239. Italics in original.)

The court then reached the same conclusion as to the exemption for *private* nonprofit institutions of higher education granted by section 3(e), noting that this exemption had been construed consistently with the welfare exemption. (*English* v. *County of Alameda*, *supra*, 70 Cal.App.3d at p. 243. See *Church Divinity Sch.* v. *County of Alameda* (1957) 152 Cal.App.2d 496 [314 P.2d 209].)

The second case, *Mann* v. *County of Alameda, supra,* 85 Cal.App.3d 505, by contrast, did involve the exemption granted by section 3(d). There, student families who occupied rental units owned by the University of California at Berkeley sought a refund of taxes which had been imposed on their possessory interests. The Court of Appeal, noting the decisions in *English* v. *County of Alameda, supra,* 70 Cal.App.3d 226, and *Church Divinity Sch.* v. *County of Alameda, supra,* 152 Cal.App.2d 496, reasoned that the "used exclusively for" phrase should be given the same meaning in section 3(d) as it had been given in section 3(e).

The *Mann* court rejected an argument that section 3(d) was intended to apply only to property that was not state owned, reasoning that "insofar as section 3, subdivision (d), might relate to state-owned property, it would be surplusage and, hence, it should not be so construed." (*Mann* v. *County of Alameda, supra,* 85 Cal.App.3d 505, 509.) The court also reasoned that an anomaly would be created if section 3(d) were not applicable to the possessory interests at issue since a student's interest would be taxable if the land were owned by the state, but if the state leased the land from a private owner and subleased to the student it would not be.

Neither *English* nor *Mann* resolves the present case for neither questioned whether under section 3(d) residential use of a privately owned home is a use that may be considered "exclusively for" the entity or organization for whose benefit the exemption was granted. We agree with the *English* court that occupancy of property owned by a charity whose purpose is to provide housing is a use that is exclusively for the charitable purpose which qualified the owner for the exemption. To tax the resident on his or her right to reside in that property would defeat the purpose of the exemption.

We do not agree, however, that all residential use of school-owned property by faculty and staff can be characterized as a use that is exclusively for school purposes. Although there have been a considerable number of cases that have grappled with the question of the tax-exempt status of faculty housing under a variety of circumstances (see generally Annot. (1974) 55 A.L.R.3d 485), plaintiffs have cited no case in which a tax exemption has been extended to a faculty member who, as in this case, uses a privately owned long-term leasehold interest in property as a site for a privately owned residence.

In one of the early, leading cases on this subject, dealing with student and faculty housing at Yale University, Connecticut's highest court specifically

distinguished between residential facilities owned by the university (as in *Mann* and *English*) and a residence owned by a faculty member, concluding that although the university-owned property that was used for housing was entitled to a tax exemption, the exemption would not apply to property in which the university held legal title, but on which a faculty member, with the university's financial assistance, had built his own, privately owned residence. (*Yale University* v. *Town of New Haven* (1899) 71 Conn. 316 [42 A. 87, 88-93, 94-95].) With respect to the latter property, which appears closely analogous to the property at issue in the case presently before us, the court stated that "[t]his presents a case of property substantially owned and enjoyed by a private person, while the title remains in the college" and concluded that such property was "held for private use," rather than for the use of the university. (42 A. at pp. 94-95.)

Arguing for a contrary result, plaintiffs place primary reliance on *Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729 [221 P.2d 31, 15 A.L.R.2d 1045], but that case is distinguishable from the present matter. In *Cedars of Lebanon*, a private nonprofit hospital corporation sought a refund of taxes that had been assessed on various portions of its property used in conjunction with the operation of its hospital. The tax exemption was sought under the "welfare" exemption now embodied in section 4(b) for property the hospital used for (1) a nurses training school, (2) housing for hospital interns, resident doctors, student nurses, and other essential employees, (3) a recreational facility—a tennis court—for its employees, and (4) a hospital thrift shop.

In determining the appropriate test to be used in deciding whether a hospital's use of its own property is sufficiently related to hospital purposes to qualify for an exemption under the welfare exemption, the *Cedars of Lebanon* court concluded that "the phrase 'property used exclusively for . . . hospital . . . purposes' should be held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of hospital purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern hospital." (35 Cal.2d at p. 736.) Applying that test to the facts before it, the court held that the property used for a nurses training school, and to provide housing for hospital interns, resident doctors, student nurses, and other essential employees qualified for the exemption, as did the recreational facilities which the hospital provided on its premises for its employees. (*Id.* at pp. 737-744.) At the same time, however, the court held that the portion of the property used for a hospital thrift shop—"an independent undertaking to raise revenue"—did not qualify for an exemption. (*Id.* at pp. 745-746.)

Plaintiffs contend that the *Cedars of Lebanon* court's construction of the phrase "used exclusively" for purposes of the welfare exemption should apply equally to the facially comparable language of section 3(d), so that property would be deemed to qualify as property "used exclusively" for public university purposes within the meaning of section 3(d) if the property is used exclusively "for any facility which is incidental to and reasonably necessary for the accomplishment of [university] purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern [university]."

Relying on cases following *Cedars of Lebanon* that have held, under the similarly phrased "private college" exemption of section 3(e), that a private college's use of its own property to provide housing for students or faculty is a use sufficiently related to the college's educational function and mission to render the property exempt from taxation (see, e.g., *Church Divinity Sch.* v. *County of Alameda, supra,* 152 Cal.App.2d 496, 505-508), plaintiffs reason that because they are using their leasehold interests for faculty housing, they too should be entitled to a tax exemption.

Contrary to plaintiffs' argument, it does not follow that simply because a hospital or private college may be entitled to a tax exemption for portions of *its* property on which it has built student dormitories or faculty housing, a faculty member is similarly entitled to a tax exemption when he or she uses a long-term leasehold interest in property leased from a university to build or maintain *a privately owned residence for his or her own use.* The flaw in plaintiffs' reasoning is the assumption that the phrase "property used exclusively for" hospital, charitable, or educational purposes necessarily has an identical meaning in two distinct situations: (1) where the property whose tax status is at issue is owned by a private person who will benefit personally from the proposed use, and (2) where the property is owned by the hospital or college for whose benefit the exemption was created.

Unlike sections 3(e) and 4(b), which are concerned with defining the permissible uses to which a charitable organization or educational institution may put its own property and claim tax exempt status, section 3(d) is concerned primarily with defining the circumstances under which property not owned by a public school or university is entitled to a tax exemption. As *Ross* v. *City of Long Beach, supra,* 24 Cal.2d 258, explains, the purpose underlying section 3(d)'s tax exemption is to encourage a private property owner to make his or her property available for the use of a public school or university, rather than for the private owner's own use. A faculty member who owns a long-term leasehold interest in university property does not

fulfill the public purpose contemplated by section 3(d) by using the leasehold interest as a site for his or her own personal residence. To grant a tax exemption to the faculty member's private long-term leasehold interest in these circumstances clearly would extend the section 3(d) exemption beyond its intended reach.

Indeed, upon close analysis, it becomes evident that plaintiffs' suggested reading of section 3(d) is untenable. Plaintiffs' argument, at bottom, rests on the premise that the use of property for "faculty housing" invariably is an "exclusive use of property for university purposes" within the meaning of section 3(d). Although plaintiffs have not claimed in this proceeding that their property interest in their privately owned homes is exempt from taxation under section 3(d), if their leasehold interest in the property on which the homes are situated is entitled to an exemption because the property is being used for faculty housing, then it is difficult to understand on what basis an exemption could be denied to the faculty members' property interest in the homes themselves. Furthermore, if, as plaintiffs maintain, the use of property for faculty housing is an exclusive use of property for university purposes under section 3(d), then a faculty member who bought a home on private property and used it as his or her family residence also could claim an entitlement to an exemption because that property too would be property used for faculty housing. As these examples demonstrate, plaintiffs proposed interpretation of section 3(d) proves too much.

The leasehold interests of plaintiffs, which are privately owned interests used for the private owner's residences, are not property used exclusively for university purposes within the meaning of section 3(d). Plaintiffs are not entitled to the exemption they seek.

### III

#### DISPOSITION

For the reasons stated in part I of this opinion, the Court of Appeal properly reversed the judgment of the superior court.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Arabian, J., and George, J., concurred. Kennard, J., concurred in the judgment only.

On March 26, 1992, the opinion was modified to read as printed above.