# IN THE SUPREME COURT OF CALIFORNIA

BARBARA MORGAN et al.,
Plaintiffs and Appellants,

v.

YGRENE ENERGY FUND, INC., et al.,
Defendants and Respondents.

_____

JANET ROBERTS et al.,
Plaintiffs and Appellants,

v.

RENEW FINANCIAL GROUP, LLC, et al.,
Defendants and Respondents.

S277628

Fourth Appellate District, Division One
D079364, D079369

San Diego County Superior Court
37-2019-00052045-CU-OR-CTL,
37-2019-00059601-CU-OR-CTL

December 4, 2025

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Evans, and Jenkins[*] concurred.

---

[*] Retired Associate Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

MORGAN v. YGRENE ENERGY FUND, INC.

S277628


Opinion of the Court by Kruger, J.


Under California law, a person who wants to challenge a tax ordinarily must first pay the tax and then seek available relief from tax authorities; if that effort is unsuccessful, the person may then file a tax refund action in court. (E.g., Rev. & Tax. Code, §§ 5097, 5140; see generally *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1307–1308.) Here we consider how these tax-challenge procedures apply in a dispute concerning a unique financing arrangement in which individuals repay funds in the form of taxes.

The arrangements at issue owe their existence to California's Property Assessed Clean Energy (PACE) program (Stats. 2008, ch. 159, §§ 1–2, p. 523 (Assem. Bill No. 811)), a program that allows local governments to provide homeowners with financing for energy efficiency home improvements in exchange for a voluntary special assessment added to their property taxes and secured by a lien on their real property. Although many local governments have adopted the PACE program, few run the program themselves; most have contracted with private companies. Plaintiffs are homeowners who have entered into PACE contracts administered by private entities. Plaintiffs allege that these private PACE administrators should have, but did not, comply with consumer protection and other regulatory requirements applicable to consumer lenders. Plaintiffs filed suit under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.),

seeking various restitutionary and injunctive remedies, including an order requiring the PACE administrators to return PACE assessment monies received and prohibiting them from collecting delinquent assessments, unless and until the assessments are lifted from their properties.

At this stage of the proceedings, the sole question is whether plaintiffs were required to follow the statutory procedures for challenging taxes — meaning that they should have started not by filing suit in court, but by paying the PACE assessments and then seeking administrative tax relief from local authorities. The answer depends on the nature of plaintiffs' claims and the relief they seek. By statute, PACE assessments are collected at the same time and in the same manner as local taxes, and so are subject to the same correction, cancellation, and refund rules as other taxes. (Rev. & Tax. Code, § 4801; Sts. & Hy. Code, § 5898.30; Gov. Code, § 53340, subd. (e); see Rev. & Tax. Code, § 4807.) Because plaintiffs' central claims for relief effectively seek to invalidate the PACE assessments and prevent their future collection, plaintiffs are required to follow the applicable statutory procedures for challenging taxes. But plaintiffs are not required to follow the statutory tax relief procedures in order to pursue other, nontax-related, remedies concerning the administration of the PACE loans. We affirm in part, reverse in part, and remand for further consideration of whether plaintiffs should be granted leave to amend their complaints to plead only claims for relief that neither directly nor indirectly challenge a tax.

## I.

We begin by describing, in general terms, the program at the heart of the controversy in this case. The Legislature first

established the PACE program in 2008, with the stated goal of promoting renewable energy sources and energy efficiency improvements to real property. (Stats. 2008, ch. 159, §§ 1–2, p. 523.) Concerned that such improvements are often cost-prohibitive (*id.*, § 2, p. 523), the Legislature enabled local governments to finance PACE loans to property owners, using existing municipal finance mechanisms. Although the mechanisms in question differ in certain respects,[1] the basics are the same. Under the relevant provisions, local governments

---

[1] Initially, when it first enacted the PACE statute, the Legislature authorized local governments to employ the procedures set forth in the Improvement Act of 1911, which was devised to fund improvements to streets, sidewalks, and other public use property. (Stats. 1911, ch. 397, §§ 1–83, pp. 730–769; Sts. & Hy. Code, § 5000 et seq.). Under the PACE amendments to the Improvement Act, a local government may issue bonds to fund PACE loans; then, to recoup the loan amount, the local government levies an assessment on the property. (Stats. 2008, ch. 159, §§ 1–2, p. 523; Sts. & Hy. Code, §§ 5898.12, subds. (a), (g), 5898.14, subd. (a)(2), 5898.28.)

A few years after it first established the PACE program, the Legislature authorized local governments to make use of a second set of municipal finance procedures, set out in the Mello-Roos Community Facilities Act of 1982 (Mello-Roos). (Stats. 2011, ch. 493, § 4 (Sen. Bill No. 555); Gov. Code, §§ 53311 et seq., 53313.5, subd. (l), 53328.1, subd. (a)(2); see generally *Building Indus. Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 68–70 [discussing the history of the Mello-Roos Act].) Under the Mello-Roos procedures, a local government repays PACE bonds by levying a special tax on properties whose owners opt into a community facilities district in which PACE improvements have been authorized. (Gov. Code, §§ 53329.6, 53340, subd. (e).)

For convenience, we use the term "PACE assessments" in this opinion to refer to both Improvement Act assessments and Mello-Roos special taxes.

are authorized to issue bonds to fund PACE loans for property owners. (Sts. & Hy. Code, §§ 5898.14, subd. (a)(2), 5898.28.) The property owners then use the money to install property upgrades (*id.*, § 5898.22(d)) — for instance, solar panels or energy-efficient windows. The PACE loan is repaid in installments by an assessment that is added to the homeowner's property tax bill and collected "in the same manner and at the same time" as local taxes, and secured by a priority tax lien that runs with the land. (*Id.*, § 5898.30; see Gov. Code, § 53340, subd. (e).)

It is possible, as the Court of Appeal observed, that the Legislature "anticipated that local governments would operate their own programs, as they did with other aspects of municipal finance." (*Morgan v. Ygrene Energy Fund, Inc.* (2022) 84 Cal.App.5th 1002, 1009 (*Morgan*).) But that is not, for the most part, how things turned out. Soon after the Legislature enacted the PACE program, private companies began offering to administer the program for local governments. Most local governments accepted the offers. (*Id.* at pp. 1009–1010.)

Plaintiffs are homeowners over the age of 65 who took out PACE loans to finance various energy efficiency improvements. Defendants Ygrene Energy Fund, Inc. and Renew Financial Group, LLC (to whom we will collectively refer as the PACE administrators) are private entities that administer the loans under contracts with local California governments.[2] In 2020,

---

[2] The named defendants also include entities that came to own security interests in PACE borrowers' homes or to whom repayment obligations on the PACE loan were transferred. One of the original defendants, Renovate America, Inc., has declared bankruptcy and is no longer a party.

two groups of plaintiffs filed two essentially identical putative class action complaints under the UCL. The two suits were later consolidated for purposes of appeal. (*Morgan*, *supra*, 84 Cal.App.5th at pp. 1010–1012.) This case comes to us on review of a judgment sustaining demurrers without leave to amend, so we assume the truth of the facts stated in the operative complaints. (E.g., *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100 (*Loeffler*).)

Under their arrangements with local governments, the private PACE administrators oversee contractors who solicit property owners to participate in the PACE program and ultimately install PACE improvements. The PACE administrators also manage multiple aspects of program financing: They arrange the sale of municipal bonds to fund the loans or purchase the bonds themselves; handle loan applications from homeowners; make loans; and arrange for PACE assessments to be placed on the tax roll.

Plaintiffs allege that when they agreed to PACE financing and to the associated voluntary assessments on their property, they did not appreciate the financial burden and risk of foreclosure involved. Plaintiffs do not claim that the PACE administrators misled or have otherwise defrauded them, but maintain that the PACE administrators should have, but failed

---

In creating the PACE programs administered by defendants, local governments obtained validation judgments to establish the overall validity of their plans to authorize the issuance of bonds and other aspects of the program. (See *Davis v. Fresno Unified School Dist.* (2023) 14 Cal.5th 671, 684–687 [describing validation statutes and procedures].) It is, however, undisputed that the validation judgments pose no bar to challenging the manner in which defendants have administered the program.

to, comply with various laws applicable to comparably situated consumer lenders, including "prophylactic measures that provide safeguards against predatory lending." (Cf. *Farmers Ins. Exch. v. Superior Court* (1992) 2 Cal.4th 377, 383 [The UCL " ' "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL] and subject to the distinct remedies provided thereunder' "].)[3]  Specifically, they allege that the defendants:  (1) included in home improvement contracts a provision that gave them a security interest in the primary residence of buyers who were over 65, in asserted violation of Civil Code, section 1804.1, subdivision (j); and (2) failed to include in PACE loan contracts a boldface warning that borrowers would risk foreclosure on their homes, in asserted violation of Civil Code section 1803.2, subdivision (b)(3).  To remedy these violations, plaintiffs request various remedies to ease or eliminate the financial burdens of PACE participation, including: (1) an injunction preventing the PACE administrators from initiating collection on any delinquent PACE assessments; (2) an order compelling PACE administrators to return any PACE assessment payments they

---

[3]   As plaintiffs acknowledge, since the events alleged in the complaints, the Legislature has enacted provisions regulating the conduct of private PACE administrators.  These provisions bar PACE administrators from entering assessment contracts without first making a good faith determination that the property owner has a reasonable ability to pay the PACE assessment's annual obligations.  They also require administrators to be licensed under the California Financing Law. (Stats. 2017, ch. 475, §§ 6, 71, 88–89, pp. 3576, 3598–3606, 3608 (Assem. Bill No. 1284).)  But before these provisions were passed, plaintiffs argue that the PACE administrators "largely operated in a perceived legal and regulatory void."

have received to the property owners who paid them; and (3) that the injunction and restitution order remain in place until PACE administrators ask local governments to remove the PACE assessments from class members' property taxes and those assessments are, in fact, removed.

In addition, plaintiffs allege that the PACE administrators failed to comply with Financial Code licensing requirements for finance lenders.[4] Plaintiffs seek the remedies prescribed by Financial Code section 22750: an injunction to prevent PACE administrators from any further collection activity if the violation is found to be willful, or, if not, then an injunction preventing PACE administrators from collecting any interest or finance charges on PACE loan repayments. (Fin. Code, § 22752, subd. (a).) Plaintiffs also seek a declaratory judgment that PACE administrators make consumer loans and are " 'sellers of home improvement services' " subject to specific licensing requirements, and an injunction preventing PACE administrators from making consumer loans until properly licensed.

Finally, plaintiffs allege that the PACE administrators improperly paid home improvement contractors directly, as

---

[4] In their UCL cause of action premised on the Financial Code, plaintiffs refer only to a "[v]iolation of Financial Code section 22750." That section, however, provides the remedy for willful violations of "any provision" of California Financing Law. (Fin. Code, § 22750, subd. (b).) It appears from the pleading — because plaintiffs contend that the PACE administrators were required to but did not obtain a finance lender license — that the alleged violation pertains to Financial Code section 22100, subdivision (a), which states that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner."

opposed to issuing a joint check to the homeowner and contractor, as assertedly required by Business and Professions Code section 7159.2, subdivision (b). To remedy this alleged violation, plaintiffs seek an injunction requiring the PACE administrators to issue joint checks payable to both the homeowner and the contractor for any future PACE financing of home improvements.

The defendant PACE administrators jointly demurred to each cause of action in the complaints on the ground that plaintiffs were required to exhaust administrative tax remedies by paying the assessments and then seeking relief from local tax authorities. (Code Civ. Proc., § 430.10, subd. (a).) Agreeing with defendants, the trial court sustained the demurrers without leave to amend and dismissed the actions. The Court of Appeal affirmed.

The Court of Appeal explained that under California law, a taxpayer generally "may not pursue a court action for a refund of property taxes without first applying to the local board of equalization for a reduction and then filing an administrative claim for a refund." (*Morgan*, *supra*, 84 Cal.App.5th at p. 1008, citing Rev. & Tax. Code, §§ 1603, subd. (a), 5097, *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1307–1308 (*Steinhart*).) Because "PACE assessments are collected 'in the same manner as ordinary ad valorem property taxes,'" they qualify as taxes subject to the statutory tax relief procedures set forth in the Revenue and Taxation Code. (*Morgan*, at p. 1013, quoting Gov. Code, § 53340, subd. (e); see Rev. & Tax. Code, § 4801 [defining " 'taxes' " to include "assessments collected at the same time and in the same manner as county taxes"].)

The Court of Appeal rejected plaintiffs' argument that the statutory tax relief provisions were inapplicable because plaintiffs had sued only private entities and did not " 'challenge any aspect of the municipal tax process involved.' " (*Morgan*, *supra*, 84 Cal.App.5th at p. 1013.)  As to the first point, the court considered it irrelevant that Morgan had sued only private entities because "it is the nature of the relief sought and the availability of an administrative remedy to achieve it — not whether the defendant is a private or public entity — that triggers the exhaustion rule." (*Id.* at p. 1015, citing *Loeffler*, *supra*, 58 Cal.4th 1081.)  And as to the second point, the court concluded that, "[d]espite their assertions to the contrary, plaintiffs do challenge their property tax assessments" (*Morgan*, at p. 1008) because they seek "injunctive relief (1) requiring 'property tax payments' to 'municipal taxing authorities' as 'PACE tax assessments' to be 'released back' to each property owner; and (2) prohibiting defendants from initiating collection procedures on delinquent accounts.  Plaintiffs ask that these orders remain in place until defendants successfully 'request[] that the local governments remove the voluntary tax assessments on the properties.' " (*Id.* at p. 1014).  All of this, the court reasoned, is effectively a request "to cancel property tax obligations and obtain a refund of taxes [plaintiffs] have already paid." (*Ibid.*)  In addition, the Court of Appeal observed, plaintiffs "allege that the PACE loans are 'void at inception for illegality' and the resulting security interest (i.e., a property tax lien) is also unlawful and 'void.' . . . [T]he net result or effect of the liability theories in the complaints would be to absolve plaintiffs of a tax liability (although not a contractual liability).  Because an administrative procedure exists to resolve that issue

in the first instance, plaintiffs were required to invoke it." (*Id.* at p. 1015, fn. omitted.)

The Court of Appeal concluded that the same is true of plaintiffs' remaining two causes of action, concerning alleged violations of Financial Code licensing requirements and the Business and Professions Code joint check requirement. The court reasoned that, like plaintiffs' other causes of action, "[t]he underlying premise of each is that defendants are either sellers of home improvement services or are engaged in the business of making loans." (*Morgan, supra*, 84 Cal.App.5th at p. 1015.) Because plaintiffs' requests for public injunctive relief on these claims "are based on the same legal theories, arise from the same alleged operative facts, and involve the same alleged primary rights" as plaintiffs' other causes of action, these requests "necessarily fail as well." (*Id.* at p. 1016.)

We granted review.

## II.

## A.

As the case comes to us, the parties have framed the issue as whether plaintiffs were required to exhaust their administrative tax remedies before filing suit. The Court of Appeal framed its holding in the same way. (E.g., *Morgan, supra*, 84 Cal.App.5th at p. 1012.) This framing is accurate, but does not tell the whole story. The requirement to exhaust administrative remedies in this context stems from a more general requirement to challenge the legality of a tax by exclusive means of the procedures set forth in the Revenue and Taxation Code. The issue before us is not just about exhaustion of administrative remedies; it is more broadly about the

exclusivity of the rules the Legislature has prescribed for challenging taxes.

Longstanding California law forbids courts from enjoining the collection of taxes, directing taxpayers instead to pay taxes and then seek relief in the manner provided by statute. The rule is enshrined in the California Constitution: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." (Cal. Const., art. XIII, § 32; see also, e.g., *Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450, 1454 [describing this as the " 'pay first, litigate later' " rule].) We have explained that this "constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues." (*Woosley v. State of California* (1992) 3 Cal.4th 758, 789.) The overarching rationale for restricting the direct filing of tax challenges in court "is to allow revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted." (*Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 283.) By routing such challenges through a legislatively prescribed recovery procedure, the law staves off the risk that tax challenges could " 'derange the operations of government, and thereby cause serious detriment to the public.' " (*Ibid.*, quoting *Dows v. City of Chicago* (1870) 78 U.S. 108, 110.)

This rule applies whether a taxpayer challenges a tax directly, by expressly seeking to prevent or enjoin its collection, or indirectly, by pursuing other relief that would have the same effect. As our case law explains, any other approach would shortchange the weighty interests underlying the prohibition on tax injunctions. (See *State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 640 ["It is also the rule that a taxpayer may not circumvent restraints on prepayment tax litigation by seeking only declaratory relief"]; *Honeywell Inc. v. State Bd. of Equalization* (1975) 48 Cal.App.3d 907, 912 ["[A]n action for a declaration that the tax is not legally collectible would circumvent the law and, accordingly, declaratory relief will be refused"]; cf. *Loeffler*, *supra*, 58 Cal.4th at p. 1131 [describing as "a troubling prospect" the possibility that an injunction preventing a retailer from collecting sales tax reimbursement from consumers "could indirectly reduce the flow of tax revenue" to the state and explaining that "statutes should be interpreted to avoid [such] potential constitutional concerns"].)

Although the constitutional anti-injunction provision, by its terms, speaks of actions against the State, the same rule has long been understood to apply to actions against counties and other local governments. (*Security-First Nat. Bank v. County of L.A.* (1950) 35 Cal.2d 319, 320.) The rule against enjoining the collection of local taxes is now codified in Revenue and Taxation Code section 4807: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected." (Rev. & Tax. Code, § 4807, added by Stats. 1977, ch. 539, § 2, p. 1741; see *Connolly v. County of Orange* (1992) 1 Cal.4th 1105, 1114 [discussing Rev.

& Tax. Code, § 4807].)  Thus, challenges to local taxes, like challenges to other kinds of taxes, may proceed only by way of actions for refund, and "actions for refund of allegedly illegal taxes [may] be brought *only in the manner prescribed by the Legislature.*"  (*Cod Gas & Oil Co. v. State Bd. of Equalization* (1997) 59 Cal.App.4th 756, 759, italics added.)

The Legislature has prescribed a comprehensive process by which a property owner can challenge the imposition of local property taxes or seek a refund of taxes paid.  This process generally includes two administrative steps and a judicial step.

For taxpayers challenging the amount of their property tax obligation, the first administrative step is to file an application for assessment reduction under Revenue and Taxation Code section 1603, subdivision (a), which provides:  "A reduction in an assessment on the local roll shall not be made unless the party affected or his or her agent makes and files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property."  " '[C]ounty board' " is defined as "a county board of supervisors meeting as a county board of equalization or an assessment appeals board."  (Rev. & Tax. Code, § 1601, subd. (a).)  Each year, each county assessor notifies each assessee (i.e., property owner) of the assessed value of its property on the local assessment roll.  (Rev. & Tax. Code, § 619, subd. (a).)  These notices reflect the property's assessed value, but not the property taxes that will be due for the fiscal year.  After receiving this notice, a property owner may file an application challenging the assessed value of their property. (Rev. & Tax. Code, § 1603, subds. (a), (b)(1).)  This application is made to the county board of equalization, which holds a hearing on each application while performing its annual function of

equalizing the assessment of all property on the local assessment roll. (*Id.*, §§ 1604, subd. (a), 1605.6.) The local roll then becomes the basis upon which property taxes are levied.

After the local assessment roll has been prepared, each county's tax collector sends out tax bills to all property owners. (Rev. & Tax. Code, § 2610.5.) These bills include the ad valorem tax, which is a percentage of the assessed value of the property, and various other fixed charges and assessments, which may or may not be based on the property's assessed value.[5] After paying the tax, a homeowner may take the second administrative step and file an administrative refund claim under Revenue and Taxation Code section 5097. Section 5096 then directs that any taxes paid shall be refunded if among other reasons, they were "[e]rroneously or illegally collected" or "[i]llegally assessed or levied." (*Id.*, § 5096, subds. (b), (c).) But, subject to certain exceptions not relevant here, no refund may be ordered unless the applicant filed a refund claim under section 5097. (*Id.*, § 5097, subd. (a)(1).) A refund claim must be filed within four years of the tax payment. (*Id.*, § 5097, subd. (a)(2).) This exhaustion rule operates alongside the prohibition on injunctions or other restraints on the collection of taxes which, as explained above, seek to avoid litigation-related disruptions

---

[5] For example, a property tax bill may include — in addition to the ad valorem tax — charges, assessments, and special taxes for: city street lighting; city libraries; school maintenance; paramedic services; fire and emergency services; mosquito abatement; lead paint abatement; hazardous waste control; public transit funding; and clean storm water. (See, e.g., *Patton v. City of Alameda* (1985) 40 Cal.3d 41, 43 [library tax]; *Hagman v. Meher Mount Corp.* (2013) 215 Cal.App.4th 82, 86 [mosquito assessment]; *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 870 [fees assessed on manufacturers producing products containing lead].)

in tax collection which could in turn interrupt the provision of public services. (*Loeffler, supra*, 58 Cal.4th at p. 1101.)

If the county refuses to grant a refund, the final step in the process is filing an action in superior court. Revenue and Taxation Code section 5140 provides that the taxpayer "may bring an action . . . against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096)." (Rev. & Tax. Code, § 5140.) "No other person may bring such an action." (*Ibid.*) "[I]f another should do so, judgment shall not be rendered for the plaintiff." (*Ibid.*) No refund action may "be commenced or maintained . . . unless a claim for refund has first been filed." (*Id.*, § 5142, subd. (a).) Moreover, "[n]o recovery shall be allowed in any refund action upon any ground not specified in the refund claim." (*Ibid.*) "If the court finds that an assessment is void in whole or in part, it shall render judgment for the plaintiff for the amount of the taxes paid on that portion of the assessment that is found to be void." (*Id.*, § 5144.) Sections 5140 and 5142 make clear that if a property owner sues a county for a refund of property taxes without first filing a refund claim with the county's board of supervisors the refund suit will be barred for failure to exhaust administrative remedies. (See, e.g., *Steinhart, supra,* 47 Cal.4th 1298, 1308; see also *LA Live Properties, LLC v. County of Los Angeles* (2021) 61 Cal.App.5th 363, 377.)

In this case, plaintiffs have neither pursued administrative refund remedies nor filed a refund action in court. At this juncture, the parties are focused exclusively on whether plaintiffs must pursue administrative refund remedies. That focus is understandable: While plaintiffs could conceivably

amend their complaint to state a refund action against the counties under Revenue and Taxation code section 5140, the failure to seek administrative refund remedies is not so easily overcome. This is presumably why the parties have framed the present controversy in terms of plaintiffs' requirement to "exhaust administrative tax remedies." But while the exhaustion requirement is immediately in view, it bears repeating that the larger question is not merely whether plaintiffs are required to exhaust their administrative remedies; it is whether plaintiffs are required to pursue relief by means of the exclusive procedure for challenging taxes — that is, by paying the taxes first and then seeking to recover the challenged amounts from the relevant authorities.

**B.**

From a taxpayer's point of view, PACE assessments resemble property taxes in pertinent respects. When a homeowner chooses to participate in the PACE program, the homeowner enters an agreement with the local government to voluntarily take on an assessment, which appears as an additional line item on a property tax bill to be remitted to the local government. But for present purposes, the critical point is that the governing statutes make clear that challenges to PACE assessments are subject to the same rules as challenges to any other form of property tax. A longstanding property tax rule provides that, for purposes of the statutory provisions governing property tax corrections, cancellations, and refunds, " 'taxes' " include "assessments collected at the same time and in the same manner as county taxes." (Rev. & Tax. Code, § 4801, added by Stats. 1939, ch. 154, p. 1361.) When the Legislature set up the PACE program, it made clear that PACE assessments are to be collected "in the same manner and at the same time as the

general taxes of the city or county." (Sts. & Hy. Code, § 5898.30; see Gov. Code, § 53340, subd. (e).) These provisions are sufficient to bring PACE assessments within the scope of the usual rules governing challenges to property taxes. (See, e.g., *Hovannisian v. City of Fresno* (2024) 107 Cal.App.5th 833, 843 [concerning other assessments collected "at the same time and in the same manner" as property taxes].)[6]

Plaintiffs argue that these exhaustion rules do not apply to them because they seek relief only against private entities, while the language of the provision authorizing postexhaustion refund lawsuits contemplates suits against public entities. (See Rev. & Tax. Code, § 5140 [authorizing "an action only in" superior court "against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund"].) But the language of section 5140 merely reflects the reality that an action challenging taxes normally must involve (at least) the governments to which the taxes have been paid. It does not mean, as plaintiffs appear to suggest, that litigants may circumvent the prescribed statutory

---

[6] The Legislature did exempt PACE financing from the notice, hearing, and protest procedures that are constitutionally required before a local government may impose assessments and special taxes. (Sts. & Hy. Code, § 5898.31 [PACE assessments "are not assessments for the purposes of Articles XIII C and XIII D of the California Constitution"]; see Gov. Code, § 53753 ["Notice, protest, and hearing requirements"].) Such requirements are presumably unnecessary where a property owner has voluntarily agreed to an assessment, as is true of PACE assessments. In any case, this limited purpose carveout does not alter the Legislature's decision to expressly include PACE assessments in the definition of "taxes" subject to the collection, cancellation, and refund procedures that apply to individual property owners. (See Sts. & Hy. Code, § 5898.30; Gov. Code, § 53340, subd. (e); Rev. & Tax. Code, § 4801.)

procedures for challenging taxes by the simple expedient of leaving the local governments out of it.

Both sides expend considerable energy debating the significance of *Loeffler*, *supra*, 58 Cal.4th 1081, another case in which we considered the exclusivity of tax remedies in a suit brought by private plaintiffs against a private defendant. In *Loeffler*, the plaintiffs brought a UCL suit against a private retailer regarding its collection of sales tax on sales of hot coffee. Under California law, sales tax is imposed on the retailer, which ultimately pays sales tax to the state; the consumer anticipatorily reimburses the retailer for those taxes. The plaintiffs claimed that the retailer had falsely represented that all its hot coffee sales were subject to sales tax and sought to enjoin the retailer's collection of sales tax reimbursement for those sales. (*Loeffler*, at p. 1092.) Even though the plaintiffs had sued only the retailer, not the State Board of Equalization, we held that their suit could not "avoid the limitations and procedures set out by the Revenue and Taxation Code" for the resolution of disputed questions of taxability, meaning that the plaintiffs would have to avail themselves of the Revenue and Taxation Code's administrative remedies. (*Ibid.*)

As relevant here, *Loeffler* makes clear that the presence of private defendants is not dispositive of the question of whether litigants must follow statutory tax relief procedures. Rather, whether litigants must comply with the Revenue and Taxation Code's exclusive procedures depends simply on whether they seek to challenge taxes. *Loeffler* is not otherwise instructive for our purposes, as our decision concerned materially different considerations related to the unique structure of the sales tax. (See *id.* at pp. 1123–1124.) *Loeffler* simply confirms that the

question does not turn on the identity of the defendants, but on the nature of the claims and the relief requested.

## C.

With this background in mind, we turn to the operative question: Do plaintiffs' requests for relief against the PACE administrators trigger an obligation to follow the statutory procedures for tax challenges?

As noted, plaintiffs' primary claim is that the PACE administrators caused them to take out PACE loans without fully understanding their financial burdens and risks, in asserted violation of consumer protection and other regulatory requirements that, in plaintiffs' view, should be found applicable to the PACE administrators. The primary form of relief sought in their complaint is an injunction requiring the PACE administrators to "release back" PACE assessment amounts to each property owner; prohibiting the PACE administrators from initiating collection procedures on delinquent accounts; and providing that these orders will remain in place until the PACE administrators successfully "request[] that the local governments remove the voluntary tax assessments on the properties." (*Morgan, supra*, 84 Cal.App.5th at p. 1014.)

The PACE administrators argue that these requests are effectively requests for court orders to cancel property tax obligations and thus must be directed to local tax authorities in the first instance. Like the two courts to have considered the issue before us, we are constrained to agree. Plaintiffs are not, of course, directly asking the local governments with whom they have contracted to cancel their PACE loans and, with them, their obligation to pay PACE assessments. But the relief they seek amounts to much the same thing: An order that would

require the equivalent of a refund of the assessments, and prevent future collections on delinquent accounts, "unless and until" PACE administrators successfully persuade local governments to remove the tax assessments on their properties. This request is thus subject to the Revenue and Taxation Code's exclusive procedures, which, as noted, apply both to suits that effectively or indirectly challenge a tax as well as to suits that explicitly or directly challenge a tax. (See *Loeffler, supra*, 58 Cal.4th at p. 1131 [noting "potential constitutional concerns" raised by an "injunction [that] could indirectly reduce the flow of tax revenue"]; *State Bd. of Equalization v. Superior Court*, *supra*, 39 Cal.3d at p. 640 [Taxpayers "may not circumvent restraints on prepayment tax litigation by seeking only declaratory relief"].)

In this court, plaintiffs have acknowledged that their complaint is written broadly, but they maintain that the remedies they seek in connection with their consumer protection causes of action need not implicate any local government interest in taxation. For instance, plaintiffs suggest that their request for an order forbidding collection on delinquent accounts would prohibit collection only by the PACE administrators, leaving local governments free to conduct their own collections if they so choose. We are not persuaded. Plaintiffs' complaints make clear that they are not merely seeking to stop PACE administrators from making collections; they are seeking to prevent collections on the assessments altogether, on the theory that the assessments are legally void. This is clear from examining the alleged violations they claim the injunction would remedy. Their first cause of action, for example, alleges a violation of the prohibition on taking a security interest in a senior's residence (Civ. Code, § 1804.1, subd. (j)), which would

void that contract provision (*id.*, § 1804.4); the second cause of action alleges a violation of the notice requirements for taking a security interest as part of a retail installment contract, which would void the entire contract (*id.*, § 1803.2); and the third cause of action alleges the willful violation of finance laws in making a loan, which would also void the contract (Fin. Code, § 22750, subd. (b)). Plaintiffs' overarching purpose in seeking to enjoin collection on delinquent accounts is manifestly not to ensure that collection is handled by some entity other than the PACE administrators; it is, rather, to put a stop to the collection of assessments under what they claim to be a void contract, "unless and until" the underlying obligation to pay the assessments is dissolved.

Plaintiffs also suggest that rather than effectively eliminating class members' PACE obligations altogether (as the complaints expressly request), the trial court could instead lift the liens on their property and convert the outstanding PACE assessments into an unsecured debt. Such a remedy would, however, run up against the governing statute: In authorizing PACE financing, the Legislature mandated that each PACE assessment "shall constitute a lien against the lots and parcels of land on which they are made, until they are paid." (Sts. & Hy. Code, § 5898.30; see Gov. Code, § 53340, subd. (h) [directing the same for special taxes].) To invalidate the liens and convert outstanding property taxes to contract- or quasi-contract-based debts is effectively to invalidate this legislatively created tax, as a tax. As such, the ordinary rules apply: Plaintiffs must seek relief from the appropriate local taxation authorities in the manner provided by the Legislature.

The bottom line is this. Because plaintiffs' consumer protection causes of action unavoidably seek to invalidate the

underlying obligation to pay PACE assessments, they run headlong into the bar on granting such relief outside of the statutory tax relief process. This is true even though plaintiffs' claims for relief may not, in terms, explicitly ask for an injunction against any collection of the assessments. Decades ago, the Court of Appeal reached a similar conclusion in *Community Facilities Dist. v. Harvill* (1999) 74 Cal.App.4th 876, 881–882, which provides a useful illustration of these principles. There, the Harvills defaulted on Mello-Roos special tax payments and the county initiated foreclosure on behalf of the bondholders. (*Harvill*, at p. 879.) The Harvills argued in defense that the county did not complete promised improvements on time, in violation of "a contractual or quasi-contractual" agreement formed by the property owners' approval of the bond sale and special taxes. (*Ibid.*) The Court of Appeal rejected the argument, ruling that allowing such a defense to foreclosure would effectively invalidate the special taxes and thus violate the prohibition on enjoining tax collection under Revenue and Taxation Code section 4807. (*Harvill*, at p. 882.) Much the same is true here: To allow plaintiffs to pursue the claims in their complaint would effectively invalidate the PACE assessments. Plaintiffs are, of course, free to argue that the PACE assessments *should* be invalidated. But the Revenue and Taxation Code requires them to make that argument to local tax authorities, employing the procedures the Legislature has established for challenging taxes.

Plaintiffs rely heavily on *City of Oakland v. California Const. Co.* (1940) 15 Cal.2d 573 for the proposition that requesting the return of money paid to a third party from an assessment or other amount treated as a tax is not a challenge to the tax itself. We can readily agree that not all such requests

amount to tax challenge, but some certainly do, and plaintiffs have not satisfactorily explained why theirs does not. This case is not like *City of Oakland*, where the local government plaintiff claimed that a contractor's unlawful conduct invalidated the contract governing an improvement project. (*Id.* at p. 574.) The city's legal theory did not depend on the proposition that the tax that had funded the improvement project was for any reason unlawful. As the *City of Oakland* court noted, the city "does not question the validity of any assessment," and "[i]f successful in its action, no assessment would be changed . . . but the property owners in the assessment district would have the benefit of any money recovered by this city in their behalf." (*Id.* at p. 578.) Here, by contrast, plaintiffs' legal theory is one that depends on declaring the PACE loans invalid, and thus it necessarily amounts to a challenge to their continuing obligation to pay PACE assessments on their property tax bills.

Plaintiffs make a final policy argument. As we have explained, the reason the law requires taxpayers to follow certain procedures for challenging taxes is to ensure that governments can "engage in fiscal planning based on expected tax revenues." (*Woosley v. State of California*, *supra*, 3 Cal.4th at p. 789.) Here, plaintiffs argue, the relevant local governments have no real interest in the fate of PACE assessments because they operate as little more than a pass-through for the private entities that administer PACE loans and hold the underlying bonds. In plaintiffs' view, there is therefore no good reason to require litigants to follow tax relief procedures designed to protect local governments' fiscal planning.

The premise of the argument is open to question; it ignores the ways in which the validity of PACE assessments is a matter of legitimate concern to the local governments involved. PACE

assessments are, of course, remitted in the first instance to the local governments, along with other components of the property tax bill. We assume with plaintiffs that local governments then transmit the bulk of those payments to the private PACE administrators, retaining for themselves only the fees and costs associated with collection. But as the PACE administrators point out, revenue from PACE assessments may be commingled with general county funds for potentially lengthy periods, and local governments may use the funds for short-term fiscal planning in the meantime. And even if local governments made no use of the assessments for any municipal purposes, an order enjoining foreclosure and other collection efforts would have a predictable effect on the marketability of PACE bonds and thus on their efforts to attract the investment they need to run the PACE program. It is presumably for these reasons that the Legislature has allowed local governments to enter into agreements, "for the benefit of bondholders" to diligently pursue foreclosure for delinquent assessments, to assign foreclosure actions to a creditor's trustee, and to specify deadlines for commencing foreclosure. (Sts. & Hy. Code, § 8830, subd. (b); see Gov. Code, § 53356.1, subd. (b) [same].)

In all events, though it is perhaps true that the usual concerns about interfering with local government financial planning are less pressing in this context than in many tax challenges, it is certainly true that the law enacted by the Legislature resolves this dispute in favor of applying the same set of rules that we apply to other tax challenges. When it enacted the PACE program, the Legislature made clear that PACE assessments were to be treated as other property taxes are, including for purposes of the exclusive procedures governing cancellation, correction, and refund of taxes.

Ultimately, plaintiffs' arguments ask us to second-guess the Legislature's judgment that PACE assessments should be treated as taxes. But the Legislature's instructions are clear, and it is the Legislature's prerogative to decide whether litigants who wish to challenge PACE assessments must follow the usual procedures for challenging taxes. To invalidate or enjoin collection of the PACE assessments without regard for these procedures would eliminate features the Legislature deliberately wrote into the PACE program when the program was created. To the extent that plaintiffs challenge the validity of the PACE assessments, established principles governing tax challenges require them to do so in the manner provided by the Legislature.[7]

## D.

Having concluded that the Revenue and Tax Code's tax refund procedures apply to plaintiffs' primary requests for relief, there remains the question of which procedures, precisely, plaintiffs are required to employ.[8]

---

[7]    Some amici curiae worry that this legal avenue is untenable because homeowners would be required to pay the entire balance of their PACE loans under this " 'pay first, litigate later' rule." The statute authorizing foreclosure, however, specifies collection of installments, interest, and other charges that are delinquent only "at the time" foreclosure commences. (Sts. & Hy. Code, § 8830, subd. (c).)

[8]    As we have explained, plaintiffs have not availed themselves of *any* potentially applicable administrative tax remedy, nor have they filed a tax refund suit under Revenue and Taxation Code section 5140. The PACE administrators note that it is not strictly necessary for us to identify precisely which of these remedies apply in order to conclude that plaintiffs' present claims challenging the validity of the PACE

As noted, the Revenue and Taxation Code lays out two administrative steps before a taxpayer may file a refund claim in court. We have previously said that each of these steps is ordinarily required: "In the property tax context, application of the exhaustion principle means that a taxpayer ordinarily may not file or pursue a court action for a tax refund without first applying to the local board of equalization for assessment reduction under [Revenue and Taxation Code] section 1603 *and* filing an administrative tax refund claim under section 5097 [of the Revenue and Tax Code]." (*Steinhart, supra,* 47 Cal.4th at p. 1308.)

---

assessments cannot proceed; whatever set of procedures apply here, plaintiffs have employed none.

But on remand or in future litigation, these plaintiffs or others may wish to seek a refund of a PACE assessment in the manner provided by the Legislature. And any plaintiff who made that choice would have to contend with the Court of Appeal's conclusion that a property taxpayer must file *both* a section 1603 application *and* a section 5097 refund claim before filing a refund action under Revenue and Taxation Code section 5140. (E.g., *Morgan, supra,* 84 Cal.App.5th at p. 1016.) That conclusion has significant practical implications for plaintiffs because of the different filing deadlines that apply to the two available administrative remedies. (See Rev. & Tax. Code, § 1603, subd. (b) [generally requiring a section 1603 application to be filed between July 2 and September 15 of the tax year in question]; Rev. & Tax. Code, § 5097, subd. (a)(2) [providing that a section 5097 refund claim may be filed at any time up to four years after the tax is paid].) As several amici curiae note, it also has potentially significant implications for the local tax authorities tasked with the resolution of such claims. Thus, rather than leaving the matter for another day, we elect to address this question, which the parties and amici curiae have fully briefed.

While this is the ordinary rule, we now clarify that, to the extent plaintiffs wish to do no more than challenge their PACE assessments on the grounds stated in their complaints, they need not begin by applying for an assessment reduction under section 1603. As we clarified with counsel at oral argument, the point is not genuinely in dispute.

As amici curiae for both sides agree, the assessment reduction process referred to in Revenue and Taxation Code section 1603 does not encompass tax refunds or other disputes about special assessments or taxes related to the PACE program. Assessment reductions appear in part 3 of division 1's property tax provisions (Rev. & Tax. Code, § 1603), and they focus on the assessed value of property for purposes of ad valorem taxation (e.g., *id.*, §§ 1603, subd. (a) [requiring a showing of the "full value of the property"], 1607 [reduction hearing addresses "the value of the property"], 1609 [evidence in a reduction hearing may include sales of comparable property], 1609.4 [assessor may introduce new evidence of "full cash value of a parcel of property" at a reduction hearing]). Unlike procedures in part 9 of division 1, regarding corrections, cancellations, and refunds (*id.*, § 4801 [defining " 'taxes' " as "used in this part" to include "assessments collected at the same time and in the same manner as county taxes"]), the Legislature has not expressly extended the part 3 procedures to special assessments or taxes. By statute, the assessor prepares the local roll, which includes, among other items, the assessed value of real estate. The statute does not, however, mention PACE assessments.[9] (Rev. & Tax. Code, §§ 109, 601, 602.) In resolving

_____

**9**    As previously noted, PACE assessments may be created using the procedures set forth in either the Improvement Act of

an assessment appeal, an assessor " 'shall equalize the assessment of property on the local roll' " by adding taxable property to the local roll, removing improper assessments, or altering the values of assessments on the roll. (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1269 (*Williams*), quoting Rev. & Tax. Code, § 1610.8; see *Williams*, at p. 1269 [detailing "the statutory scheme for assessment appeals"].) But PACE assessments are not based on the assessed value of property, and no statute provides for their inclusion on the local roll (see Rev. & Tax. Code, § 602). Given the limited scope of these procedures, plaintiffs were not required to comply with the requirements for seeking an assessment reduction.

It is true that taxpayers are sometimes required to seek assessment reductions even where they are not raising valuation questions. In *Williams, supra,* 2 Cal.5th at p. 1267, we held that persons who seek to challenge a property tax on the ground that they do not own the property are still required to first seek an assessment reduction. Our decision relied on specific statutory provisions evincing "affirmative indications of the Legislature's desire" that the non-ownership claim at issue

---

1911 (Stats. 1911, ch. 397, §§ 1–83, pp. 730–769; Sts. & Hy. Code, § 5000 et seq.) or the Mello-Roos Community Facilities Act of 1982 (Stats. 2011, ch. 493, § 4 (Sen. Bill No. 555); Gov. Code, § 53311 et seq.). The Legislature has provided separate mechanisms for recording assessments under each act. (See Sts. & Hy. Code, § 5898.32 [directing the recording of "the existence and amount of each contractual assessment with the county recorder of the county in which the lot or parcel is located"]; Gov. Code, § 53325.1, subd. (a)(3) [requiring a resolution establishing a community facilities district to designate the entity "responsible for preparing annually a current roll of special tax levy obligations"].)

"be submitted to a local board through the assessment appeal process in the first instance." (*Id.* at p. 1271.) We did not hold, however, that absent such indications of legislative intent, *every* nonvaluation question must go through the assessment reduction process. For reasons already explained, the requirement does not apply here.

That leaves the requirement for a taxpayer to seek a refund of taxes "[e]rroneously or illegally collected" or "[i]llegally assessed or levied" (Rev. & Tax. Code, § 5096, subds. (b), (c)) by filing a refund request. As noted, the Legislature defined taxes for purposes of correction, cancellation, or refund to include "assessments collected at the same time and in the same manner as county taxes." (*Id.*, § 4801.) This is a straightforward directive to apply Revenue and Taxation Code refund procedures to special assessments the Legislature has designated as taxes, as California courts have previously recognized. In *Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 737, for example, where the plaintiff challenged a special assessment lien for unpaid garbage collection fees, the court ruled that Revenue and Taxation Code section 4801, and a statute providing for the collection of delinquent garbage fees " 'at the same time and in the same manner' " as ad valorem taxes, required the plaintiff to exhaust administrative procedures in seeking a refund. That case, in turn, relied on *Hanjin Internat. Corp. v. Los Angeles County Metropolitan Transportation Authority* (2003) 110 Cal.App.4th 1109, 1113, which determined that the statute of limitations for initiating administrative tax refund procedures under Revenue and Taxation Code section 5097 applied to the plaintiff's application for a refund of a Public Utilities Code special assessment that was collected " 'at the same time and in the same manner' " as

other taxes. Again, PACE assessments are also collected at the same time and in the same manner as ad valorem taxes (Sts. & Hy. Code, § 5898.30; Gov. Code, § 53340, subd. (e)), and so are subject to the refund procedures contained in sections 5096 and 5097 of the Revenue and Taxation Code. Thus, to challenge the validity of a PACE assessment plaintiffs must first pay the amounts due and then file refund requests under section 5096 raising their claims that PACE administrators unlawfully secured and levied PACE assessments on seniors' properties.

Refund requests may raise a broader range of claims of error or illegality than assessment reductions. (Rev. & Tax. Code, § 5096, subds. (b), (c).) Although plaintiffs appear to suggest that their claims are outside the competence of local tax authorities, we find the argument unpersuasive. The boards of supervisors (*id*., § 5099) are ultimately the same entities responsible for launching the PACE programs, authorizing the issuance of PACE bonds, and contracting with PACE administrators. Given the boards of supervisors' familiarity with and substantial responsibility for the PACE programs, channeling challenges to the legality of PACE administrator practices and to the validity PACE assessments through the tax refund process in the first instance would appear to appropriately respect the role of local governments in evaluating the legal and practical consequences that flow from plaintiffs' allegations.[10]

---

[10]    The Attorney General, appearing as an amicus curiae in support of plaintiffs, argues that it would be futile to require plaintiffs to seek refunds on the grounds specified in Revenue and Taxation Code section 5096, and to present their claims to the county boards of supervisors sitting as boards of equalization. Because the plaintiffs themselves have not

### E.

The obligation to employ statutory tax relief procedures applies, of course, only to the extent litigants wish, directly or indirectly, to challenge taxes. To the extent plaintiffs here seek relief other than relief from their obligation to pay PACE assessments, they are not required to employ statutory tax relief procedures. For present purposes, it remains to be determined whether plaintiffs seek *only* relief that would enjoin or otherwise establish the invalidity of their obligation to pay PACE assessments — or whether they also seek relief that targets only the manner in which the PACE administrators have administered the program, without also seeking to cancel the underlying obligation to pay voluntary assessments in accordance with the statutes establishing the program.

On the face of the complaints, it appears that plaintiffs did, at least at one time, seek remedies limited to the manner in which the PACE administrators run the program, without necessarily seeking to prevent or enjoin the collection of PACE assessments. For instance, in connection with the final cause of action alleged in the complaints, plaintiffs seek an injunction requiring PACE administrators to issue joint checks to homeowners and contractors when financing future improvements. This request for injunctive relief does not directly or indirectly seek a declaration that the contracts

_____

invoked any recognized exception to the exhaustion requirement, we do not decide whether the doctrine of futility, or any other exception, might ever excuse a plaintiff's failure to exhaust their administrative tax remedies by seeking a refund under section 5097. Nor do we opine on whether section 5097 may be subject to the doctrine of equitable tolling.

governing plaintiffs' participation in the PACE program are invalid, nor does it seek the functional equivalent of a refund or cancellation of taxes. The Court of Appeal held that this claim for relief was barred for the same reason as the other claims — that is, because it rests on a premise that PACE administrators are subject to the same set of regulatory requirements as consumer lenders and sellers of home improvement services, and stems from the same alleged operative facts as the other causes of action. (*Morgan, supra*, 84 Cal.App.5th at pp. 1015–1016.) This is perhaps a reason why the trial court was correct to grant the demurrer as to the entirety of the complaint, but it does not explain why plaintiffs should not be granted leave to amend it, should they so choose, to state the claim in a manner that does not effectively challenge the obligation to pay PACE assessments.

We acknowledge that plaintiffs have not challenged the Court of Appeal's analysis as to these remedies; they have instead remained focused exclusively on the primary remedies they sought in their complaints, including the invalidation of their PACE assessments. But plaintiffs' request in this regard illustrates that it is at least theoretically possible for plaintiffs to amend their complaint to bring only claims that do not effectively constitute challenges to their obligation to pay PACE assessments. And, at least until now, plaintiffs have not had the benefit of this court's guidance on how the obligation to pursue statutory tax relief applies differently to claims aimed at the administration of the PACE contracts rather than at their validity. Because it may be possible for plaintiffs to bring UCL claims related to the conduct of PACE administrators without implicating the validity of the PACE assessments, we conclude plaintiffs should have the opportunity to argue that they should

be permitted to pursue such remedies without first having to exhaust administrative tax remedies.  We accordingly remand the case to the trial court to consider whether, in light of the discussion in this opinion, plaintiffs should be granted leave to amend.

### III.

#### CONCLUSION

We affirm the Court of Appeal's judgment to the extent it concluded that plaintiffs may not pursue an injunction or order preventing the collection of PACE assessments or premised on a legal theory requiring a determination that the PACE assessments are invalid.  We reverse the court's judgment to the extent it affirmed the trial court's decision to sustain the demurrer as to plaintiffs' other remedies and theories without leave to amend.  We remand to the Court of Appeal for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**EVANS, J.**
**JENKINS, J.** [*]

---

[*] Retired Associate Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Morgan v. Ygrene Energy Fund, Inc.

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 84 Cal.App.5th 1002
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S277628
**Date Filed:** December 4, 2025

---

**Court:**  Superior
**County:**  San Diego
**Judge:**  Richard S. Whitney

---

**Counsel:**

James Swiderski for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen, Michael Gowe and Rachel A. Foodman, Deputy Attorneys General, for the California Attorney General and the State Board of Equalization as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel Francis Alper, Natasha E. Blazer and Audrey Powers Thornton for Housing and Economic Rights Advocates, California Low-Income Consumer Coalition, Center for Consumer Law & Economic Justice, East Bay Community Law Center, Public Law Center, National Housing Law Project and Haven Neighborhood Services as Amici Curiae on behalf of Plaintiffs and Appellants.

Alysson R. Snow for University of San Deigo School of Law, Housing Rights Legal Clinic, Public Counsel, Elder Law and Advocacy and CAARMA as Amici Curiae on behalf of Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, Fredrick S. Levin and Ali M. Abugheida for Defendants and Respondents Ygrene Energy Fund, Inc., GoodGreen 2016-1, GoodGreen 2017-1, GoodGreen 2017-2, GoodGreen 2018-1, GoodGreen 2019-1, GoodGreen 2015 LLC, GoodGreen 2016-1 LLC, GoodGreen 2016-1 Trust, GoodGreen Holdings 2016- A Trust, GoodGreen 2017-1 Trust, GoodGreen Funding 2016-1 LLC, GoodGreen Funding 2017-1 LLC, GoodGreen Funding 2017-2 LLC, GoodGreen Funding 2017-R1 LLC, GoodGreen Funding 2018-1 LLC, GoodGreen Holdings 2016-A Trust, Renew Financial Group, LLC, Renew 2017-1, Renew 2017-2 and Renew 2018-1.

Reed Smith, Jesse L. Miller, David J. de Jesus and Emily Lynch for Defendant and Respondent Wilmington Trust, N.A.

Akin Gump Strauss Hauer & Feld, Neal R. Marder and Aileen M. McGrath for Defendants and Respondents Golden Bear 2016-1, LLC, Golden Bear 2016-2, LLC, and Golden Bear 2016-R, LLC.

Thomas R. Parker, Deputy County Counsel (Los Angeles), for the California State Association of Counties and the County Assessors' Association as Amici Curiae on behalf of Defendants and Respondents.

Dawyn R. Harrrison, County Counsel (Los Angeles), and Richard Girgado, Principal Deputy County Counsel, for Jeffrey Prang as Amicus Curiae on behalf of Defendants and Respondents.

Renne Public Law Group and Michael K. Slattery for Michael K. Slattery as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James Swiderski
325 West Washington Street #2125
San Diego, CA 92102
(858) 775-8769

Ali M. Abugheida
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105
(415) 619-3418